## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| **BOBBY CURRY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 07-0199 (JR)** |
| | ) | |
| **ALBERTO GONZALES, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## DEFENDANTS' MOTION TO DISMISS COMPLAINT, OR
## IN THE ALTERNATIVE, TO TRANSFER VENUE

Pursuant to Federal Rules of Civil Procedure 12(b)(1), (5) and (6), defendants Alberto Gonzales, the Attorney General of the United States, and Harley Lappin, Director, Federal Bureau of Prisons (BOP), named in both their official and individual capacities, and Peter Geren, Acting Secretary of the Army (Army) in his official capacity and former Secretary of the Army Francis Harvey in his individual capacity, respectfully request that this Court dismiss Plaintiff's claims in their entirety. Defendants respectfully refer the Court to the attached memorandum in support of this motion. A proposed order is also attached hereto.

*Pro se* Plaintiff is hereby advised that failure to respond to a dispositive motion may result in the district court granting the motion and dismissing the case. See Fox v. Strickland, 837 F.3d 507, 509 (D.C. Cir. 1988).

Respectfully submitted,

___/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

____/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

_____/s/_____
QUAN K. LUONG
Special Assistant United States Attorney
555 Fourth Street, N.W., Room E-4417
Washington, D.C. 20530
(202) 514-9150 (telephone)
(202) 514-8780 (facsimile)

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
**BOBBY CURRY,**                          )
                                          )
                **Plaintiff,**            )
                                          )
        **v.**                            )        **Civil Action No. 07-0199 (JR)**
                                          )
                                          )
**ALBERTO GONZALES, et al.**              )
                                          )
                **Defendants.**           )
_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS COMPLAINT, OR
<u>IN THE ALTERNATIVE, TO TRANSFER VENUE</u>**

**INTRODUCTION**

Defendants hereby submit this memorandum of law in support of their motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(1), (5), and (6). For the reasons set forth below, the defendants respectfully request that the Court dismiss this matter in its entirety.

**BACKGROUND**

*Pro se* plaintiff, Bobby Ray Curry, Register Number 11324-045, is an inmate currently housed at the Rivers Correctional Institution (RCI) at Winton, North Carolina. Compl. at ¶ 5. The United States Army Court-Martial sentenced plaintiff to a term of thirty years on a modified sentence, for attempt to commit murder, assault, and battery. Plaintiff began serving his sentence in December, 1993, and has a projected release date of February 7, 2012. Compl. at ¶5. On August 31, 1998, plaintiff was transferred to BOP custody. After several transfers, plaintiff was designated to the United States Penitentiary in Atlanta, Georgia, where he stayed until February of 2000. Subsequently, he was transferred and designated to the Federal Correctional Institution,

McKean, in Bradford, Pennsylvania, where he stayed from February 25, 2000 until June 16, 2005. Subsequently, on June 29, 2005, he was transferred and designated to the Rivers Correctional Institution (RCI), administered by the GEO Group, Inc, and located in Winton, North Carolina.

Plaintiff filed the instant complaint on or about January 30, 2007 pursuant to Bivens.[1] Compl. at 1. Specifically, plaintiff alleges that his First, Eighth, and Fourteenth Amendment rights were violated: (1) when he was denied a kosher diet in or around December, 2006 and (2) when he was denied a clean air environment by being exposed to second hand smoke. Id. at 4-12. Plaintiff names as defendants Alberto Gonzales, the Attorney General of the United States, Harley Lappin, Director, BOP, and Francis J. Harvey, Secretary of the Army.[2] Id. at 1-4. The individual defendants are named in both their official and individual capacities. Id. Plaintiff also appears to allege that the denial of a kosher diet constitutes a violation of the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc. Id. at 4, 8.

As relief, plaintiff requests nominal and punitive damages in the amount of $75,001.00 and $350,000.00, respectively, from each of the individual defendants. Compl. at 18-19. He also seeks the following injunctive relief: (1) an order directing prison officials to provide him with kosher meals; (2) a transfer to a federal facility within 500 miles of his legal residence; and (3) an order directing defendants to remove cigarette lighters and designated smoking area signs from

---

[1] Bivens v. Six Unknown Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).

[2] Peter Geren, Acting Secretary of the Army, is substituted for former Secretary Francis Harvey in his official capacity. E.g. Rule 25(d)(1), Fed. R. Civ. P.

all entrances/exits at least 50 feet.  Id.

## ARGUMENT

A.    **Sovereign Immunity Bars Any Constitutional or RFRA Claims for Monetary Damages Against the BOP, DOJ, or Army and Against the Individual Defendants In Their Official Capacities**

To the extent that plaintiff seeks monetary damages against the BOP, DOJ, and Army or against the individual defendants in their official capacities for alleged constitutional or RFRA violations, these claims must be dismissed absent a waiver of sovereign immunity.  Meyer v. Reno,  911 F. Supp. 11 (D.D.C. 1996); Marshall v. Reno, 915 F. Supp. 426 (D.D.C. 1996); Deutsch v. U.S. Dept. of Justice, 881 F. Supp. 49, 55 (D.D.C. 1995).  The inherent sovereign immunity of the United States protects it and its agencies [such as the BOP, DOJ, and Army] from suit absent express waiver.  See United States v. Nordic Village, 503 U.S. 30 (1992). Sovereign immunity also bars suits for money damages against officials in their official capacities for nondiscretionary acts absent a specific waiver by the government.  Clark v. Library of Congress, 750 F.2d 89, 101-02 (D.C. Cir. 1984).  The RFRA provides no waiver of governmental immunity, nor does its legislative history suggest such a result.  Webman v. Federal Bureau of Prisons, 441 F.3d 1022, 1026 (D.C. Cir. 2006); see also Meyer v. BOP, 929 F.Supp. 10, 14 (D.D.C. 1996)  The purpose of the RFRA was merely to "restore the compelling interest test previously applicable to free exercise cases" prior to the Supreme Court's decision in Employment Division v. Smith, 494 U.S. 872 (1990).  Meyer at 14 ("[T]he purpose of [RFRA] is only to overturn the Supreme Court's decision in Smith ").  Plaintiff's complaint does not contain

any colorable basis for such a waiver.[3]  Therefore, to the extent plaintiff asserts claims for

monetary damages against the BOP, DOJ, and Army or against the individual defendants in their

official capacities, such claims must be dismissed for lack of subject matter jurisdiction.

**B.      Plaintiff Has Not Perfected Service Against Individual Defendants**

None of the individual defendants in this action were properly served with the complaint

in accordance with the rules applicable to individual defendants.  Simpkins v. District of

Columbia Government, 108 F.3d 366, 369 (D.C. Cir. 1997).  It is well established that, in an

action against a federal employee in his or her individual capacity, the individually-sued

defendant must be served with process in accordance with Rule 4(e) of the Federal Rules of Civil

Procedure.  Id.  Rule 4(e) provides that service is effectuated by complying with the laws of the

state for such in which the district court is located by delivering a copy of the summons and

complaint to the defendant (or his appointed agent) personally, or by leaving copies thereof at the

defendant dwelling house or usual place of abode with some person of suitable age and discretion

who resides there.  Fed. R. Civ. P. 4(e).  The SCR-Civil 4(e)(2) allows for service upon

individuals by first class, certified or registered mail.  Actual notice will not, of course, substitute

for technically proper service under Rule 4 and will not permit the Court to render a personal

judgment against an individually-sued defendant.  Sieg v. Karnes, 693 F.2d 803 (8th Cir. 1982);

See also Stafford v. Briggs, 444 U.S. 527 (1980).

In this case, plaintiff served the individual defendants only at their respective places of

---

[3] When a plaintiff seeks monetary relief in tort against a department of the United States, the only possible basis for relief would be under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b).  Plaintiff does not assert that he has exhausted necessary administrative remedies under the FTCA, which is a prerequisite to bringing an FTCA claim.  GAF Corp. v. United States, 818 F.2d 901, 904-05 & n.6 (D.C. Cir. 1987).

4

employment.  See Docket Entries 5, 6, and 9.  Service at the defendant's place of employment is

not proper service.  Because the record in this action is devoid of any evidence of proper personal

service upon the federal defendants in their individual capacities, this action cannot proceed

against them individually and all claims against the defendants in their individual capacity should

be dismissed.

The District Court will lack jurisdiction over the federal officials in their individual

capacity, until all of the provisions of Rule 4(i)(1) and (2) are met.  Ecclesiastical Order of the

Ism of Am, Inc. v. Chasin, 845 F.2d 113, 116 (6th Cir. 1988); Sanchez-Mariani v. Ellingwood,

691 F.2d 592, 594 (1st Cir. 1982).  It is the plaintiff in a civil action who has the burden of

establishing the validity of service of process.  Grand Entertainment Group, Ltd. v. Star Media

Sales, Inc., 988 F.2d 476, 488 (3d Cir. 1993); Lensel Lopez v. Cordero, 659 F. Supp. 889, 890

(P.R. 1987).  Therefore, if that cannot be demonstrated, the individual claims should be

dismissed based upon insufficiency of service of process under Fed. R. Civ. P. 12(b)(5).

Accordingly, claims against the individual defendants should be dismissed.

**C.    Defendants Are Entitled To Qualified Immunity[4]**

All of plaintiff's constitutional claims should also be dismissed because defendants are

entitled to qualified immunity.  The plaintiff is seeking monetary damages against individual

defendant government officials.  Qualified immunity shields government officials from suit in

performance of a discretionary function unless that official's conduct violated a clearly

established constitutional or statutory right of which a reasonable person would have known.

---

[4] Although not properly served, and hence, not proper parties in their individual
capacities, defendants Gonzales, Lappin, and Harvey would also be protected from personal
liability by qualified immunity.

Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Id. The D.C. Circuit, in Farmer v. Moritsugu, 163 F.3d 610, 613 (D.C. Cir. 1998), explained:

> In short, "[a]n official is ... entitled to summary judgment [on qualified immunity grounds] unless '[t]he contours of the right [were] sufficiently clear that a reasonable official would [have] underst[ood] that what he [was] doing violate [d] that right.' " Harris v. District of Columbia, 932 F.2d 10, 13 (D.C. Cir. 1991) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987), aff'd 922 F.2d 443 (8th Cir. 1990)).

By "provid[ing] government officials with the ability reasonably to anticipate when their conduct may give rise to liability for damages," Anderson, 483 U.S. at 646, the doctrine of qualified immunity strikes a balance between compensating those injured by official conduct and protecting the Government's basic ability to function. See Harlow, 457 U.S. at 813-14. In other words, qualified immunity is designed to mitigate the social costs of exposing government officials to personal liability--costs such as "distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." Id. at 816; see also Harris, 932 F.2d at 13. To this end, qualified immunity provides not simply a defense to liability, but also "an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).

    In determining whether a correctional official is entitled to qualified immunity from

personal liability for money damages, there is a two-step process that must be followed by a federal court. <u>Saucier v. Katz</u>, 121 S. Ct. 2151 (2001). A court must always begin with this first step: "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" <u>Id.</u> at 2156. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." <u>Id.</u> Therefore, if the first portion of the two-pronged test is not met, that is, there is no constitutional violation, then the defendants are entitled to qualified immunity. <u>See</u> <u>Farmer v. Moritsugu</u>, 163 F.3d 610, 613 (D.C. Cir. 1998) (no Eighth Amendment showing of deliberate indifference by BOP Medical Director; therefore, he was entitled to qualified immunity); <u>Verdecia v. Adams</u>, 327 F.3d 1171, 1177 (10th Cir. 2003) ("Because <u>Verdecia</u> cannot meet the first portion of the two-pronged test, the defendants are entitled to qualified immunity.").

In the instant action, the plaintiff fails to allege a single unconstitutional act (or omission) committed by the individually named defendants. As stated above, conclusory allegations without supporting facts or allegations against each named defendant cannot form a <u>Bivens</u> claim upon which relief may be granted. <u>See</u> <u>Martin v. Malhoyt</u>, 830 F.2d 237, 254 (D.C.Cir. 1987). Here, the complaint does not specifically allege that any of the defendants personally took any action in furtherance of any alleged constitutional violations. At most, it merely alleges that these defendants were deliberately indifferent to inmate safety through improper policy and supervision, essentially a respondeat superior allegation.

Assuming arguendo the complaint could be interpreted to sufficiently state each named defendant committed unconstitutional acts, plaintiff failed to articulate how these constitutional rights were clearly established. Anderson v. Creighton, 483 U.S. 635, 640 (1987). Accordingly, even under the facts as alleged in the complaint, each of the named individual defendants is entitled to qualified immunity, and should be dismissed from this lawsuit.

**D.      Plaintiff Fails to State a Claim Upon Which Relief Can be Granted**

Even assuming arguendo that this Court has subject matter jurisdiction over the complaint and that plaintiff properly effected service upon the individual defendants, plaintiff's various claims should also be dismissed for failure to state a claim.

**1.      Plaintiff states no basis for Bivens claims brought against defendants Gonzales, Lappin, or Harvey and respondeat superior may not be the basis of a Bivens suit**

Respondeat superior has been consistently rejected as a basis for the imposition of §1983 or Bivens liability. Marshall v. Reno, 915 F.Supp. 426, 430 (D.D.C. 1996); see also Monell v. Dep't of Social Srvcs, 436 U.S. 658, 691 (1978); Boykin v. District of Columbia , 689 F.2d 1092, 1097-99 (D.C. Cir. 1982); Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1987). In the absence of allegations that the named defendants personally participated in the events that gave rise to the plaintiff's claims or any corroborative allegations to support the inference that these defendants had notice of or acquiesced in such events, dismissal is appropriate. Marshall at 429-30. See also Cameron v. Thornburg, 983 F.2d 253, 258 (D.C. Cir. 1993) (complaint naming Attorney General and BOP Director as defendants based on theory of respondeat superior, without allegations specifying their involvement in the case, do not state Bivens claim); Rizzo v. Goode, 423 U.S. 362 (1976) (defendants in Bivens action dismissed if no personal involvement

8

or participation in alleged unconstitutional actions).

In the instant case, plaintiff fails to set forth any specific allegations of direct involvement or participation by defendants Gonzales, Lappin, or Harvey in any alleged Constitutional violations against him. In fact, other than mentioning these three individuals in the caption to his complaint and under the named "parties" section, plaintiff makes no mention of these individuals anywhere else within the body of his complaint. See Compl. at 1-3. Rather, just as in the Cameron case, the plaintiff seems to be basing his claim against defendants Gonzales, Lappin, and Harvey in their individual capacities on an assumption that based on their positions, they each bear responsibility for the acts of their subordinates. This is an insufficient basis upon which to maintain a Bivens claim. See Bivens v. Six Unknown Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).

To the extent that plaintiff predicates this complaint upon the general supervisory responsibilities of Gonzales, Lappin, or Harvey, absent any specific allegations of direct involvement by any of these defendants in such violations, any Bivens claims against them must be dismissed.

### 2. Plaintiff fails to state a valid Religious Freedom Restoration Act (RFRA) claim

On November 16, 1993, Congress enacted RFRA, which reads as follows:

(a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person –

> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest.

(c)  Judicial relief

A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government.  Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

Religious Freedom and Restoration Act of 1993, 42 U.S.C.A. § 2000bb.  The RFRA was Congress' way of returning to the compelling governmental interest First Amendment analysis abrogated in Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990).  The RFRA statute does not provide definitions of its key terms "substantial burden," "compelling governmental interest," and/or "least restrictive means."  See id.  The Legislative Committee encouraged Courts to look at cases prior to the Smith case for guidance with respect to those definitions.  See S. Rep. 103-111.  Though inmates are allowed to bring claims under RFRA, its legislative history shows that Congress intended through the enactment of this statute for courts to accord prison administrators due deference.[5]

---

[5] In so doing, the Committee explained:

> The Committee does not intend to act to impose a standard that would exacerbate the difficult and complex challenges of operating the Nation's prisons and jails in a safe and secure manner.  Accordingly, the committee expects that the courts will continue the tradition of giving due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.

S. Rep. 103-111, 1993 U.S.C.C.A.N. 1892, 1899-1900 (July 27, 2993) (footnote omitted).

Under RFRA, the government cannot substantially burden a person's exercise of religion. "Inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the [A]ct's requirements." S. Rep. No. 103-111.  In order to state a claim under RFRA, a plaintiff must allege facts demonstrating that a sincerely held religious belief has been substantially burdened by the government policies.  Henderson v. Kennedy, 253 F.3d 12 (D.C. Cir. 2001); Jackson v. District of Columbia, 89 F. Supp.2d 48 (D.D.C. 2000).  Once the Plaintiff has met the burden of showing a substantial burden on his sincerely held beliefs, the burden then shifts to the government to demonstrate that application of a burden to the person's religion is:  (1) in furtherance of a compelling government interest and (2) is the least restrictive means of furthering that compelling governmental interest.  42 U.S.C. § 2000bb-1(a), (b).

### a.    Plaintiff was denied a kosher diet because he failed to provide the prison chaplain with the requested information and documentation

Plaintiff's allegations regarding the alleged denial of a kosher diet are confusing, difficult to discern, and in some instances, contradictory.  For example, in one breath, plaintiff alleges that he was flatly denied a kosher diet because he does not practice the Jewish faith and in the next, he admits that RCI Chaplain Brown interviewed him about his Santeria religion in December, 2006 and asked him to provide information supporting his claim that Santeria requires a kosher diet.[6]  Compl. at ¶ 35 and Ex. 10.  Moreover, though plaintiff appears to claim that he was denied a kosher diet because he is non-Jewish, he does not identify any RCI or BOP regulations or policies that mandate the denial of kosher meals under such circumstances.

---

[6] Plaintiff avers that he practices the religion of Santeria and appears to claim that a kosher diet is somehow consistent with his religion.  Compl. at 4-8, ¶¶ 14-37.

11

As set forth in the attached declaration, Chaplain Brown explains that at no time has he ever denied the plaintiff a kosher diet because he does not practice the Jewish faith.[7]  Exhibit 1, ¶ 4.  Rather, Chaplain Brown explains that the plaintiff was denied a kosher diet because he failed to provide the requisite information and documentation necessary to demonstrate that he has a sincerely held belief that is religious in nature.  Id. at ¶¶ 4-7.  On at least two occasions, Chaplain Brown personally interviewed the plaintiff and asked him to provide information or documentation that substantiates his claim that the exercise of his Santeria religion warrants a kosher diet and each time, he has failed to do so.  Id. at ¶ 4.  Chaplain Brown explains that it was the plaintiff's unwillingness or inability to provide the requested information that was the basis for the denial of a kosher diet, not the fact that he does not practice the Jewish faith.  Id. at ¶¶ 4, 7.

### b.    Plaintiff does not demonstrate a sincerely held belief

As he failed to do before Chaplain Brown, plaintiff also fails before this Court to allege, let alone demonstrate, that a kosher diet is a sincerely held belief that is religious in nature.  In Wisconsin v. Yoder, 406 U.S. 205, 215-16 (1972), a case preceding Smith, supra, and the passage of RFRA, the Supreme Court cautioned that "[a]lthough a determination of what is a 'religious' belief or practice entitled to constitutional protection may present a most delicate

---

[7] Both RCI and BOP policies provide that the prison chaplain will meet with the prisoner regarding his request for a religious diet and determine the prisoner's needs for such a diet.  RCI policy provides, in pertinent part, that "meals for inmates, whose religious beliefs require the adherence to religious dietary laws, will be approved by the Chaplain."  Exhibit 2, RCI Policy and Procedure Manual, 23.001, ¶VI.E.1.  BOP policy provides, in pertinent part, that "the chaplaincy team will review the request to determine how to accommodate the inmate's religious dietary needs."  Exhibit 3, BOP Program Statement 5360.09, ¶ 18.a(2).

question, the very concept of ordered liberty precludes allowing every person to make his own

standards on matters of conduct in which society as a whole has important interests."

This Circuit has looked at the religious practices of a particular religion and found that

there must be a connection between the religious practice sought and the religion.  As the Court

explained in Levitan v. Ashcroft, 281 F.3d 1313 (D.C. Cir. 2002):

> A court may also consider whether the litigants' beliefs find any support in the religion to which they subscribe, or whether the litigants are merely relying on a self-serving view of religious practice.  This inquiry is not a matter of deciding whether appellants' beliefs accord in every particular with the religious orthodoxy of their church.  See Smith, 494 U.S. at 887, 110 S.Ct. at 1604 (holding that courts should not question the "validity of particular litigants' interpretations" of their creeds) (citing Hernandez v. Comm'r, 490 U.S. 680, 699, 109 S.Ct. 2136, 2148-49, 104 L.Ed.2d 766 (1989)).  Nor is it a matter of adjudicating intrafaith differences in practice or belief. See Thomas v. Review Bd. of the Ind. Employment Sec. Div., 450 U.S. 707, 716, 101 S.Ct. 1425, 1431, 67 L.Ed.2d 624 (1981) (holding that "it is not within the judicial function and judicial competence to inquire whether the petitioner or [another member of his faith] more correctly perceived the commands of their common faith," because "[c]ourts are not arbiters of scriptural interpretation").  Instead, a court may determine whether the litigants' views have any basis whatsoever in the creed or community on which they purport to rest their claim.  For example, a Catholic litigant who asserted that it was part of his religion to wear sunglasses would be making a claim "so bizarre ... as not to be entitled to protection" under the First Amendment. Id. at 715, 101 S.Ct. at 1431.  The litigant's assertion of a view so totally foreign to the creed with which he claimed to affiliate might well lead the court to question his sincerity.  It is therefore unlikely that a litigant challenging a rule limiting his right to wear sunglasses could satisfy the threshold requirement.

> Levitan at 1321.

RFRA explains that 'religious exercise" includes "any exercise of religion, whether or not

compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A).  The

"exercise in question" must be religious in nature.  See Sample v. Lappin, 2006 WL 833130, 4

(D.D.C. 2006).  Reviewing RFRA cases reveals that there must be a connection between the

religion and the religious exercise sought or belief professed.  See Levitan, supra (use of

13

sacramental wine by Catholics during communion); Gartrell v. Ashcroft, 191 F.Supp.2d 23 (D.D.C. 2002) (Muslim and Rastafarian inmates' belief in long hair and beards); Wisconsin v. Yoder, 406 U.S. 205 (1972) (preventing government from compelling Amish parents to force their children to attend school based on a long history of identifiable religious beliefs).

In the instant case, plaintiff avers that he practices the religion of Santeria and appears to claim that a kosher diet is somehow consistent with his religion.[8]  Compl. at 4-8, ¶¶ 14-37. Beyond conclusory allegations, however, plaintiff does not provide any explanation for how or why a kosher diet is related to the exercise of his Santeria religion.  Id.  Mere conclusory allegations are not enough to carry that burden.  "[A] court must accept only well-pleaded allegations of fact, it need not accept 'legal conclusions.'"  Taiwo Okusami v. Psychiatric Inst. of Washington, Inc., 959 F.2d 1062, 1069 (D.C. Cir. 1992), quoting 5A Wright & Miller, Federal Practice and Procedure, § 1357, at 315; see also Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994).

### c.    Plaintiff does not allege a substantial burden

Even assuming arguendo that plaintiff has alleged and shown a sincerely held religious belief to a kosher diet, he fails to show that any applicable RCI or BOP policies or regulations substantially burdens his Santeria beliefs.  To show a substantial burden, "[t]he interference must be more than an inconvenience; the burden must be *substantial* and an interference with a tenet or belief to religious doctrine."  Graham v. Commissioner of Internal Revenue Service, 822 F.2d 844, 850-51 (9th Cir. 1987), *aff'd sub nom*, Hernandez, *supra*.  "A substantial burden constitutes

---

[8]  Notably, plaintiff admits that he has in fact been offered a vegetarian diet.  Compl. at ¶ 35.

'putting substantial pressure on an adherent to modify his behavior and to violate his beliefs.'"

Cockrell-El v. District of Columbia, 937 F.Supp. 18 (D.D.C., 1996) (quoting Hobbie v.

Unemployment Appeals Comm'n of Fla., 480 U.S. 136, 141, 107 S.Ct. 1046, 1049, 94 L.Ed.2d

190 (1987)).  "A substantial burden does not arise merely because 'the government refuses to

conduct its own affairs in ways that comport with the religious beliefs of particular citizens.'"

Alliance for Bio-Integrity v. Shalala, 116 F.Supp.2d 166 (D.D.C., 2000)(quoting Bowen v. Roy,

476 U.S. 693, 699, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986)).

     In Henderson v. Kennedy, 253 F.3d 12 (D.C. Cir. 2001), the D.C. Circuit Court found the

challenged regulation which banned the sales of T-shirts in the mall was content neutral and did

not discriminate among viewpoints.  Id. at 16.  The plaintiffs still had a "multitude of means" to

spread the gospel as the plaintiffs could still distribute the T-shirts for free or sell them

elsewhere.  Id.  Essentially, the Court found the regulation did not force plaintiffs "to engage in

conduct that their religion forbids or that it prevents them from engaging in conduct their religion

requires....  Nor does the regulation 'significantly inhibit or constrain conduct or expression that

manifests some central tenet of [plaintiffs'] beliefs.'" Id. at 17.  See also Lynn v. Northwest

Indian Cemetery Protective Association, 485 U.S. 439, 450-51 (1988)(same); Branch Ministries

v. Rossotti, 40 F.Supp.2d 15, 25 (D.D.C.,1999), affirmed 211 F.3d 137 (D.D.C. 2000)(same);

Cockrell-El, supra, at 21 (same).  The plaintiffs were not forced to change their practices nor

were they forced to violate a tenet of their religion.  Thus, the Court upheld the regulation since it

did not impose a substantial burden on the plaintiffs.  See also Thiry v. Carlson, 78 F.3d 1491

(10th Cir. 1996) (finding no substantial burden in a case in which the governmental action did not

cause the plaintiffs to change their religious practices; indeed, plaintiffs would continue with

their religious beliefs and practices even after implementation of the challenged action).

In the context of prisons, in Gartrell v. Ascroft, this Court evaluated a case in which the Virginia Department of Corrections' (VDOC) grooming policy precluded BOP inmates housed in the VDOC from complying with the fundamental tenet of their religions (i.e., Rastafarian and Muslim) which prohibited men from shaving their faces. 191 F.Supp.2d 23, 25 (D.D.C. 2002). BOP inmates in VDOC institutions sued on the basis of RFRA. In order to ensure compliance with the grooming regulation, VDOC went as far as forcibly shaving inmates and placing them in segregation for failure to voluntarily comply with the grooming regulation. Id. at 26. The Court found a substantial burden on the inmates' religious beliefs as they were forced to violate a fundamental tenet of their religion. Id. at 26-27. See e.g., Cockrell-El v. District of Columbia, 937 F.Supp. at 21 (finding no substantial burden as the Plaintiff contended the alleged assault occurred after the Plaintiff attended the service and neither prevented the Plaintiff from participating in his religious practice nor pressured him to `commit an action that would violate his religion. Id. The plaintiff failed to show that "the state condition[ed] receipt of an important benefit upon conduct proscribed by a religious faith, or [that] it denie[d] such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." Id.); Sherbert v. Verner, 374 U.S. 398, 406 (1963) (finding that conditioning "the availability of benefits upon the appellant's willingness to violate a cardinal principle of her religious faith effectively penalizes the free exercise of her constitutional liberties.").

In this case, plaintiff's allegations do not rise to the level of a substantial burden. At most, the failure to provide him with a kosher diet is only an inconvenience which does not

significantly inhibit or constrain his religious conduct or expression. As discussed above, plaintiff has failed to explain how a kosher diet is central to his Santeria religious beliefs. There is simply nothing in the complaint that indicates that the failure to provide plaintiff with a kosher diet constitutes any fundamental or substantial interference with the exercise of his religious beliefs. An inconvenience to an inmate's dietary preferences is not considered a substantial interference.[9]

### 3.    Plaintiff fails to state a valid First Amendment claim

It is well settled that several threshold requirements must be met before a particular belief, alleged to be religious in nature, is accorded First Amendment protection. Specifically, a court must decide whether the beliefs avowed are both: (1) sincerely held and (2) religious in nature. Levitan v. Ashcroft, 281 F.3d 1313, 1320 (D.C. Cir. 2002) citing Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993). The challenged rule must also burden a central tenet or important practice of the litigant's religion. Id. If these threshold requirements are met, only then does the Court turn to an examination of the regulation at dispute. As discussed above, however, plaintiff fails to demonstrate a sincerely held belief that is religious in nature, nor does he establish that a kosher diet is a central tenet of his Santeria

---

[9] It is unclear exactly what RCI or BOP regulations or policies are being challenged by plaintiff's RFRA claim. As discussed in fn 10, to the extent that plaintiff is challenging RCI and BOP regulations and policies that permit the prison chaplain to interview the prisoner and assess his need for the requested religious diet, these regulations and policies are in furtherance of a compelling government interest. See fn 9. Moreover, such practices also demonstrate a least restrictive means of furthering that compelling governmental interest. See 42 U.S.C. § 2000bb-1(a), (b).

religion.  For these reasons, plaintiff fails to state a First Amendment claim.[10]

### 4.    Plaintiff fails to state a valid Fourteenth Amendment or Equal Protection claim

Plaintiff further contends that the denial of a Kosher diet also constitutes an Equal Protection violation under the Fourteenth Amendment.  Compl. at ¶¶ 14-37, 94.  The guarantee of equal protection by the federal government is secured by the Fifth Amendment, not the Fourteenth Amendment.  Bolling v. Sharpe, 347 U.S. 497, 499 (1954).  It is undisputed that the defendants in this case are all federal officials and the plaintiff does not allege that any constitutional deprivations were accomplished under color of state law.  As such, plaintiff's equal protection claim under the Fourteenth Amendment is inapplicable.  For purposes of this motion, defendants will presume that plaintiff intends to raise his equal protection claim under the Fifth Amendment.

---

[10] Even assuming, however, that plaintiff could meet these threshold showings, he does not specifically identify any RCI or BOP regulations or policies that restrict or otherwise prohibit the free exercise of his religious beliefs.  As discussed above, though plaintiff initially alleges that he was flatly denied a kosher diet because he is not Jewish, he then admits that Chaplain Brown interviewed him in December, 2006 and asked him to provide information supporting his claim that Santeria requires a kosher diet.  Compl. at ¶ 35 and Ex. 10; see also Exhibit 1, ¶ 4.  Moreover, Chaplain Brown explains that it was the plaintiff's unwillingness or inability to provide requested information that was the basis for the denial of a kosher diet, not the fact that plaintiff was not Jewish.  Exhibit 1 at ¶¶ 4, 7.

Assuming, however, that plaintiff objects to the RCI and BOP regulations and policies that permit the prison chaplain to interview the prisoner and assess his need for the requested religious diet, defendants submit that there these regulations and policies are reasonably related to legitimate penological interests.  See Turner v. Safley, 482 U.S. 78, 89 (1987).  Among other things and tracking with the law in the area, prisons and their personnel must be able to assess whether a prisoner's request for a particular diet is the result of a sincerely held religious belief.  As the Third Circuit Court of Appeals noted in Dehart v. Horn, 227 F.3d 47, 52 (2000), "[i]t is in this way that prisons are protected from random requests for special diets by inmates whose alleged dietary restrictions are not the result of their religious convictions but rather their secular predilections."

The Equal Protection Clause demands that the government apply its laws in a rational and nonarbitrary manner.  See  Plyler v. Doe, 457 U.S. 202, 216 (1982);  Pryor-El v. Kelly, 892 F.Supp. 261(D.D.C. 1995).  However, "the conscious exercise of some selectivity in enforcement is not itself a federal constitutional violation." Pryor-El, 892 F.Supp. at 270 (quoting Oyler v. Boles, 368 U.S. 448, 456 (1962).  For an equal protection claim to be validated in the prison context, an inmate who is not in a protected class must establish two necessary predicates.  First, the inmate must establish that he or she was treated differently than other prisoners in his or her circumstances.  Id. (citing Brandon v. District of Columbia Bd. of Parole, 823 F.2d 644, 650 (D.C.Cir. 1987).  Second, he or she must establish that such unequal treatment was the result of intentional or purposeful discrimination.  Id.

Plaintiff's complaint fails to clearly explain how he was treated differently.  Plaintiff's claim fails under this level of scrutiny.  Even assuming that plaintiff could establish this first predicate, he has not shown the requisite proof of different treatment or intent to discriminate. See McCleskey v. Kemp, 481 U.S. 279, 297 (1987) (holding that a complaining party must show "*exceptionally clear proof*" that the government abused its discretion) (emphasis added).  Absent any showing at all, this claim is without merit.

### 5.        Plaintiff fails to state a valid RLUIPA claim

Though his allegations are sparse at best, plaintiff also appears to be raising a claim under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc ("RLUIPA") Compl. at 8-9.  After the Supreme Court determined that the RFRA was unconstitutional as applied to state and local governments in City of Boerne v. Flores, 521 U.S. 597, 536 (1997), Congress enacted the RLUIPA in 2000.  The language of RLUIPA mirrors the language of

RFRA, "but its scope was limited to laws and regulations concerning land use and institutionalized persons." Madison v. Riter, 355 F.3d 310, 315 (4th Cir. 2003). Congress based authority for RLUIPA on the Spending and Commerce Clause powers. See 42 U.S.C. §§ 2000cc-1(b)(1)-(2) (Section 3 of RLUIPA applies when the burden at issue is "imposed in a program or activity that receives Federal financial assistance" and in cases which "the substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes"). The statute provides protection of the religious exercise of institutionalized persons:

> (a)    General rule. No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. §§ 2000cc. The statute defines an institution as "any facility or institution which is owned, operated, or managed by, or provides services on behalf of any ***State or political subdivision of a state***." 42 U.S.C. § 2000cc-1 (emphasis added). Moreover, RLUIPA only applies to the government of a "state, county, municipality or other government created under the authority of a state" 42 U.S.C. § 2000cc-5(4) (emphasis added). RLUIPA concerns state rather than federal prisons, as "RLUIPA deals exclusively with state, rather than federal, prisons." Lovelace v. Lee, 472 F.3d 174, 217 (4th Cir. 2006); Petersen v. Price, 2007 WL 1651850 (N.D.W.Va.) ("the statutory language clearly shows that the protection afforded to institutionalized persons under [RLUIPA] applies only to prisoners incarcerated in state or local institutions and not in the Federal BOP."). The statute also concerns state, as compared to federal actions, as it "prohibits the States from imposing substantial and unjustified burdens on

20

the religious liberty of state prisoners." <u>Madison v. Virginia</u>, 474 F.3d 118, 123 (4th Cir. 2006).

RLUIPA does not create a cause of action against the federal government or its correctional

facilities. <u>Yerushalayim v. United States Dept. of Corrections</u>, 374 F.3d 89, 92 (2d Cir. 2004).

     RLUIPA does not apply to private contract facilities of the BOP as the court will still

consider these contract facilities to be federal correctional facilities. Additionally, private

contract facilities of the BOP are not facilities of a state, county, or municipality, nor are they

managed or operated by the state. <u>See</u> 42 U.S.C. §§ 2000cc-1-5(4). In <u>Bloch v. Samuels</u>, 2006

WL 2239016 (S.D.Tex.), a former federal inmate was incarcerated in a privately run Community

Corrections Center to serve the final six months of his sentence after being incarcerated at

Beaumont FCC. The center operated under a contract with the BOP and housed federal inmates.

The inmate sued the owner of the center and three of its employees concerning his request to

attend certain religious services, claiming the defendants violated his rights under RLUIPA.

<u>Bloch</u>, 2006 WL 2239016 at 1. The court stated the plaintiff had no valid claim under RLUIPA

as it does not apply to the federal government. <u>Id</u>. at 7. Similarly, in <u>Jackson v. Federal Bureau</u>

<u>of Prisons</u>, the plaintiff who was incarcerated at Rivers, a BOP contract facility, also alleged a

claim under RLUIPA. 2006 WL 2434938 at 1 (D.D.C.) (not reported). In ruling on BOP's

motion to dismiss, the court held that the plaintiff could not bring a RLUIPA claim against the

BOP as federal defendants because RLUIPA "does not create a cause of action against the federal

government or its correctional facilities." <u>Id.</u> at 3 <u>citing</u> <u>Yerushalayim</u>, 374 F.3d at 92.

     RLUIPA applies exclusively to state prisons and has no application in federal prisons.

<u>Ish Yerushalayim v. U.S.,</u> 374 F.3d 89 (2d Cir. 2004); <u>Benning v. Georgia</u>, 391 F.3d 1299 (11th

Cir. 2004). <u>See also</u> 42 U.S.C. § 2000cc-2 and cc-5. Thus, the Plaintiff's claims under RLUIPA

must be dismissed.

### 6.    Plaintiff fails to state a valid Eighth Amendment claim

Plaintiff also alleges an Eighth Amendment violation when the defendants "knowingly

expose[d] plaintiff to levels of second-hand tobacco smoke 'that pose an unreasonable risk of

serious damage to his future health.'"  Compl. at 9.  Plaintiff maintains that he is often forced to

walk by a number of designated smoking areas in the RCI recreation yards and as a result, he is

exposed to "poisonous toxins and chemicals from second-hand tobacco smoke."  Id. at 9-12, ¶¶

39-59.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."  U.S.

Const. Amend. VIII.  When evaluating claims for cruel and unusual punishment, courts make a

two-part inquiry:  (1) whether the defendants acted with a sufficiently culpable state of mind (the

"subjective component"), and (2) whether, in light of "contemporary standards of decency," the

alleged deprivation was sufficiently serious to rise to the level of a constitutional violation (the

"objective component").  Wilson v. Seiter, 501 U.S. 294, 298 (1991).  The subjective component

is satisfied by showing "deliberate indifference" by prison officials.  Id. at 303.  See Estelle v.

Gamble, 429 U.S. 97, 105 (1976) ("deliberate indifference to a prisoner's serious illness or

injury" violates the Eighth Amendment).  "[D]eliberate indifference entails something more than

mere negligence [but] is satisfied by something less than acts or omissions for the very purpose

of causing harm or with knowledge that harm will result."  Farmer v. Brennan, 511 U.S. 825, 835

(1994).  See Whitley v. Albers, 475 U.S. 312, 319 (1986) ("It is obduracy and wantonness, not

inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and

Unusual Punishments Clause, whether that conduct occurs in connection with establishing

conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock."). To constitute cruel and unusual punishment, conduct "must involve more than ordinary lack of due care for the prisoner's safety; mere negligence will not suffice." Morgan v. Dist. of Columbia, 824 F.2d 1049, 1057 (D.C. Cir. 1987) (citing Whitley, 475 U.S. at 319).

In Helling v. McKinney, 113 S.Ct. 2475 (1993), the Supreme Court examined the issue of a prisoner's exposure to second hand smoke.[11] In Helling, the Court applied this same two prong test and concluded that in order to succeed on an Eighth Amendment claim based upon exposure to second hand smoke or environmental tobacco smoke (ETS), a prisoner must prove both an objective element, that he is being exposed to unreasonable high levels of ETS, and the subjective element, that prison officials have shown deliberate indifference to his exposure. In Helling, the plaintiff, a Nevada State prisoner, was confined to a facility which did not have any smoking polices in effect. In fact, there were no non-smoking areas available to non-smoking inmates. Further, the plaintiff was housed in a cell with a cellmate who smoked five packs of cigarettes per day. The Court remanded Helling with instructions to the lower court to consider both the objective and subjective elements in light of the fact that the plaintiff had been transferred to a different facility which had some sort of smoking/non-smoking policy in effect. The Court commented:

> With regard to the objective factor, he may have difficulty showing that he is being exposed to unreasonably high ETS levels, since he has been moved to a new prison and no longer has a cellmate who smokes, and since a new state prison policy restricts

---

[11] The D.C. Circuit has applied the Helling standard in Scott v. District of Columbia, 139 F.3d 940, 942 (D.C.Cir. 1998) (recognizing Helling as the key decision in cases involving exposure to second hand smoke).

smoking to certain areas and makes reasonable efforts to respect non-smokers' wishes with regard to double bunking. He must also show that the risk of which he complains is not one that today's society chooses to tolerate. The subjective factor, deliberate indifference, should be determined in light of the prison authorities' current attitudes and conduct. The inquiry into this factor also would be an appropriate vehicle to consider arguments regarding the realities of prison administration.

Helling, at 2477.

In the instant case, plaintiff has not and cannot meet the standards set forth in Helling to show that his exposure to ETS rises to the level of an Eighth Amendment violation. First, he fails to satisfy the objective prong, that is, that he was exposed to unreasonable levels of ETS, or that the alleged deprivation is objectively "sufficiently serious." Wilson v. Seiter, 501 U.S. 294, 297 (1991). In order to satisfy this prong, the inmate must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm. See Helling, supra, at 29. In this case, unlike in Helling, plaintiff admits that there are a number of designated non-smoking areas in the prison. Compl. at ¶ 46. He also admits that smoking is allowed only in designated, outdoor areas and that inmates are not allowed to smoke in their housing units. Id. at 40, 45. At most, plaintiff argues that he is forced to walk by smokers in outdoor recreational areas and that sometimes inmates smoke in the housing units. Compl. at ¶ 41-59. Plaintiff cites to an article in "USA Today" regarding the health risks posed by second hand smoke. However, as this Court has explained, "[g]eneral scientific studies regarding the effects of ETS are not sufficient to satisfy plaintiff's burden of establishing an Eighth Amendment violation." Hinton v. Williams, 2005 WL 486137, 3 (D.D.C. 2005). In order to prevail, "plaintiff must provide some kind of ''scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that . . . injury to [his] health'' was actually caused by exposure to ETS." Id. at 2 (quoting

Helling, supra, at 36).  Plaintiff has failed to proffer such evidence and has failed to prove the "objective element" of the Helling test.

Even assuming that plaintiff could show that he is being exposed to unreasonable high amounts of ETS, plaintiff fails to offer any allegations that demonstrates that defendants Gonzales, Lappin, or Harvey or any other prison officials acted with "deliberate indifference" that resulted in a constitutional deprivation.  Specifically, plaintiff does not allege that he advised any of the named defendants of the alleged exposure or that they otherwise had any knowledge of such exposure.  See Risley v. Hawk, 918 F.Supp. 18, 24 (D.D.C. 1996) (inmate's Eighth Amendment claim dismissed for failure to state a claim where plaintiff alleged that he sent letters to defendants, high level prison officials, complaining of alleged abuses; court held that the letters alone did not demonstrate "subjective knowledge of the risk" to the inmate that gives rise to a claim under the Eighth Amendment).  Even if defendants Gonzales, Lappin, or Harvey were aware of such exposure, given the ambiguity of the plaintiff's complaint, it is also unclear whether this knowledge alone would even rise to the level of "deliberate indifference" violative of the Eighth Amendment.  Accordingly, this Eighth Amendment claim should be dismissed.

**7.    Plaintiff does not have a constitutional or statutory right to be housed in the institution of his choice**

Plaintiff also avers that the defendants violated 10 U.S.C. § 858 by transferring him to a non-federal contracted prison.  Compl. at 12, ¶¶ 60-65.  Article 58(a) of the Uniform Code of Military Justice, ("UCMJ"), codified at 10 U.S.C. § 858, provides:

> Under such instructions as the Secretary concerned may prescribe, a sentence of confinement adjudged by a court-martial or other military tribunal, whether or not the sentence includes discharge or dismissal, and whether or not the discharge or dismissal has been executed, may be carried into execution by confinement in any

25

place of confinement under the control of any of the armed forces or in any penal
or correctional institution under the control of the United States, or which the
United States may be allowed to use.  Persons so confined in a penal or
correctional institution not under the control of one of the armed forces are subject
to the same discipline and treatment as persons confined or committed by the
courts of the United States or of the State, District of Columbia, or place in which
the institution is situated.

10 U.S.C. § 858 (a) (2005).  Plaintiff does not dispute that he is in a correctional institution

"which the United States may be allowed to use."  Id.  Accordingly, he is subject to the same

treatment as other persons confined by the courts of the United States in which the institution is

situated.

Plaintiff fails to state a claim upon which relief can be granted because he fails to identify

how his confinement in a non-federal contracted prison has resulted in different discipline and

treatment than other prisoners in the institution.  Although he claims that he is "being denied a

religious-based diet and exposed to second-hand tobacco smoke," Compl. at 12-13, he fails to

plead and prove that the other prisoners in the institution are not subjected to the same treatment.

A military  prisoner is not subject to improper discrimination resulting from subjection to a

system that is harsher or different than that for prisoners confined in a different institution, so

long as the prisoner is treated the same as any other military prisoner confined in federal prison.

See Bates v Wilkinson, 267 F.2d 779, 780 (5th Cir. 1959) (upholding application of the federal

prison's harsher good time system to a military prisoner); see also Cosgrove v. Smith, 697 F.2d

1125, 1143 (D.C. Cir. 1983) (noting this Circuit has expressly adopted the reasoning in Bates).

Plaintiff thus fails to establish that his treatment subjects him to different treatment than other

military prisoners in his current institution.  See 10 U.S.C. § 858.

Moreover, it is well established that federal prisoners do not have a protected liberty

26

interest in a particular institution and that BOP has complete and absolute discretion in

determining place of confinement.  See, e.g. Ostrer v. BOP, No. 89-5028, 1989 WL 128033 at 1

(D.C. Cir. 1989) (per curiam summary affirmance); see also Pugliese v. Nelson, 617 F.2d 916,

923-35 (2d Cir. 1980); United States v. Laughlin, 933 F.2d 786 (9th Cir. 1991); United States v.

Jalili, 925 F.2d 889 (6th Cir. 1991).  Courts have long recognized that the authority to incarcerate,

classify, and transfer federal prisoners falls within the broad discretion of the BOP, and indeed a

Court lacks the authority to order that a prisoner be confined in any particular institution.

Designation ". . . decisions are within the sole discretion of the Bureau of Prisons."  United

States v. Williams, 65 F.3d 301, 307 (2d Cir. 1995); see also United States v. Restropo, 999 F.2d

640, 645 (2d Cir. 1993) ("The Bureau is given a great deal of flexibility with the respect to the

assignment of any prisoner to a correctional facility."); Leibowitz v. United States, 729 F.Supp.

556, 561 (E.D. Mich. 1989), aff'd 914 F.2d 256 (6th Cir. 1990) ("The Bureau of Prisons enjoys

almost absolute discretion over assignment, transfer, and conditions of confinement.").  Thus,

plaintiff does not have a right to be incarcerated in the prison of his choice and has failed to state

a claim upon which relief may be granted.

**E.      Transfer to the Eastern District of North Carolina is Appropriate**

If this action is not dismissed, the Court should transfer this matter to the United States

District Court for the Eastern District of North Carolina, pursuant to 28 U.S.C. § 1404(a), for the

convenience of the parties and witnesses and in the interest of justice.[12]  See Starnes v. McGuire,

---

[12]  28 U.S.C. § 1404 (a) provides:

> For the convenience of parties and witnesses, in the interest of justice, a
> district court may transfer any civil action to any other district or division
> where it might have been brought.

512 F.2d 918, 927-31 (D.C. Cir. 1974) (in assessing whether transfer is appropriate in prisoner cases, the court should consider such factors as the difficulty in communicating with counsel, difficulty in transferring the prisoner, the availability of witnesses and files and speed of final resolution).

In this case, the factors identified in Starnes and § 1404 (a) strongly support transfer to the district of the plaintiff's current incarceration. As discussed above, plaintiff is currently housed at the RCI in Winton, North Carolina. Even if plaintiff had alleged facts giving rise to an articulable, concrete injury arising from the wrongs he alleges, this action would most appropriately be brought in the United States District Court for the Eastern District of North Carolina. Plaintiff challenges actions witnessed by individuals located in North Carolina, allegedly causing injury to plaintiff in North Carolina, and the plaintiff and his records are located in North Carolina. Moreover, the decisions challenged by the plaintiff were made by the prison administrators in North Carolina. The central issues in this case are whether RCI's denial of a kosher diet violates the First Amendment, the Fourteenth Amendment, the RFRA, or the RLUIPA, whether the plaintiff's alleged exposure to second-hand smoke violates the Eighth Amendment, and whether his transfer to RCI violates 10 U.S.C. § 858. In order to litigate these issues, the parties will need to present detailed evidence regarding conditions at RCI and the circumstances under which RCI made those decisions. Neither RCI nor its officials are located in this district.

Moreover, upon entering discovery, the testimony of RCI officials, and other evidence

---

This statutory provision for transfer applies as well to civil actions in which there are special venue provisions outside of U.S.C. Title 28. Smithkline Corp. v. Sterling Drug, Inc., 406 F. Supp. 52 (D.C. Del. 1975).

28

located in North Carolina, are indispensable to the litigation of this case. During discovery, testimony will be needed regarding various operational aspects of RCI, including: (1) RCI policies, procedures, rules, and regulations regarding diets and smoking in the institution; (2) the reasons for the denial of plaintiff's request for a kosher diet; (3) the identity of all persons responsible for, or participating in RCI's decision regarding religious diets and smoking; (4) RCI's instructions to its employees and inmates regarding religious diets and smoking;, and (5) inmates' reactions to these policies and instructions. Thus, plaintiff seeks to litigate a complex set of factual issues regarding conditions of confinement in RCI without filing his case in North Carolina and without suing RCI or any of its officials. As a result, the parties face the unnecessary challenge of trying to achieve a fair result without proper access to most of the necessary evidence.

Finally, it is worth noting that because of plaintiff's tactic, the entity which arguably has the biggest stake in this litigation – RCI – is not here to protect its interests. Consequently, the Court is faced with the prospect of ruling on the constitutionality of a policy promulgated and enforced by a private contractor over whom it has no jurisdiction. The Court can avoid that prospect by simply transferring the case to North Carolina, where it should have been filed in the first place.

Historically, the District of Columbia Circuit and this Court have expressly rejected the notion that inmates incarcerated in other jurisdictions can challenge their conditions of confinement in this district simply because it is the location of the Federal Bureau of Prisons (BOP) Central Office. The BOP has approximately 200,000 inmates in more than 100 institutions nationwide. Courts have correctly recognized the danger of giving all of those

inmates the opportunity to bring their claims here.  As the District of Columbia Circuit Court has

stated, "Courts in this circuit must examine challenges to personal jurisdiction and venue

carefully to guard against the danger that a plaintiff might manufacture venue in the District of

Columbia."  Cameron v. Thornburgh, 983 F.2d 253, 256 (D.C. Cir. 1993).  Indeed, the District of

Columbia Circuit has recognized that "many, if indeed not most, petitions filed by prisoners not

confined in the District of Columbia and not sentenced here originally, will tend to involve

factors that make transfer to the place of incarceration appropriate."  Starnes v. McGuire, 512

F.2d 918, 926 (D.C. Cir. 1974) (en banc).  This is just such a case.

     If not dismissed, transfer of this case is clearly appropriate under Starnes.  "In some cases

the claim will require testimony or files most easily obtained at or near the place of incarceration.

In such cases, the district in which the institution is located will ordinarily be the more

convenient forum."  Id. at 931.  This is one of those cases.  Plaintiff alleges that he is being

subjected to improper conditions of confinement in RCI located in North Carolina, pursuant to

policies adopted and implemented by RCI.  Therefore, most of the documents and witnesses

required to litigate plaintiff's claims are located in North Carolina.

## CONCLUSION

     For all of the foregoing reasons, this action should be dismissed.  If it is not dismissed, it

should be transferred to the  United States District Court for the Eastern District of North

Carolina pursuant to 28 U.S.C. §1404(a).

                    Respectfully submitted,

                    _____/s/_____
                    JEFFREY A. TAYLOR, D.C. BAR # 498610
                    United States Attorney

_____/s/_____

RUDOLPH CONTRERAS, D.C. BAR # 434122

Assistant United States Attorney

_____/s/_____

QUAN K. LUONG

Special Assistant United States Attorney

555 Fourth Street, N.W., Room E-4417

Washington, D.C. 20530

(202) 514-9150 (telephone)

(202) 514-8780 (facsimile)

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on this 13th day of July, 2007, I caused service of the foregoing **DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE** to be made on the *pro se* plaintiff via first class mail:

> **BOBBY RAY CURRY, JR**
> CI RIVERS
> P.O. Box 630
> Winton, NC 27986-0630
> Register No. 11324-045

Respectfully submitted,

\_\_/s/_____
QUAN K. LUONG
Special Assistant United States Attorney
555 Fourth Street, N.W., Room E-4417
Washington, D.C. 20530
(202) 514-9150 (telephone)
(202) 514-8780 (facsimile)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BOBBY CURRY,                      )
                                  )
              Plaintiff,          )
                                  )
                                  )
         v.                       )        CIVIL ACTION 07-0199 (JR)
                                  )
ALBERTO GONZALEZ, et al.,         )
              Defendants.         )
                                  )

## DECLARATION OF JAMES K. BROWN

In accordance with 28 U.S.C. § 1746, I, JAMES K. BROWN, make the following declaration, under penalty of perjury, pertinent to the above-styled and numbered case:

1.    I am the chaplain for the Rivers Correctional Institution (RCI), administered by the GEO Group Inc, in Winton, North Carolina, and have been employed in this capacity since January 16, 2001.

2.    As a chaplain, it is my duty to provide a full pastoral ministry to inmates of all faith groups which includes opportunities for public and private worship on Sundays and other holy days. In addition, I also evaluate and process inmate requests for religious diets.

3.    I am familiar with the claims made by Mr. Bobby R. Curry, Register Number 11324-045, in the above civil action, and the information contained in this declaration is based upon both personal knowledge and information maintained in the Religious Services files at RCI.

4.    At no time have I ever denied Mr. Curry a request for a Kosher or otherwise religious diet for the reason that he is not Jewish or that he does not practice the Jewish faith. In an attempt to determine whether or not Mr. Curry has a sincerely held belief that is religious in

nature, I have personally interviewed and discussed this matter with Mr. Curry on at least two occasions and each time, I have asked him to provide me with information or documentation which supports his claim that the exercise of his Santeria religion warrants a Kosher diet. Each time, he has failed to do so. For example, on or about December 18, 2006, I met with and interviewed Mr. Curry. During this interview, Mr. Curry indicated that his Santeria religion warranted a Kosher diet. However, when I asked him what the religious basis was for his request, he stated words to the effect that this is just "how I feel" and was unwilling or unable to provide any other information or documentation in response to my questions. Later than day, Mr. Curry submitted an inmate request form renewing his request for a Kosher diet. The inmate request form provided some information regarding why Mr. Curry believed that a Kosher diet was necessary. Again, however, I reiterated to him that he needed to provide additional information to substantiate his claims. To date, Mr. Curry has never provided me with any information or documentation necessary to assess and substantiate his need for a Kosher or otherwise religious diet. Moreover, RCI Religious Department has no record that he has complied with and completed the required forms to make a formal request for a Kosher diet.

5.      In addition to my interviews of Mr. Curry, I have also conducted my own research on the dietary requirements of the Santeria religion, including consulting with the Bureau of Prisons Technical Reference Manual, researching the Internet, and contacting the "Temple of the Santeria" religion, in an attempt to find a connection or support for Mr. Curry's request for Kosher meals. I did not find any connection between one and the other. Moreover, the Santeria clergy informed me that a Kosher diet was not part of their religious practices and that there was no connection between a Kosher diet and the Santeria religion.

6.    Mr. Curry has also indicated at times that he does not actually require only a

Kosher diet, but that he is also amenable to a vegetarian diet.

7.    To the extent that Mr. Curry has been "denied" a Kosher diet, it is due to his

unwillingness or inability to provide me with any information or documentation that

substantiates his claim that his Santeria religion requires a Kosher diet, in addition to my own

research which has found no such connection, and the fact that he is otherwise amenable to a diet

other than a Kosher diet (i.e. vegetarian diet).


I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief.  Executed on this 12th day of July, 2007

                                        JAMES K. BROWN
                                        Chaplain, Rivers Correctional Institution

3

| | Rivers Correctional Institution<br>POLICY and PROCEDURE MANUAL | Policy Number:<br>23.001 |
|---|---|---|
|  | CHAPTER:  Religious Services | Effective Date:<br>01/04/01 |
| | TITLE:  Religious Programs | Revision Dates:<br>02/21/05;04/05/07 |
| | RELATED ACA STANDARDS:  4-4512, 4-4513,<br>4-4514, 4-4515, 4-4516, 4-4517, 4-4519, 4-4520, 4-4521 | Last Review Date:<br>04/05/07 |

## I.    PURPOSE

To establish uniform procedures for the institutional religious activities and to ensure reasonable and equitable opportunities for inmates to practice their individual religious faith consistent with the security and orderly operations within budgetary and personnel limitations. Religious services provide religious counseling and spiritual guidance for the varying faiths and religious ideologies and provides spiritual guidance, religious counseling and pastoral care to aid inmates in crisis or family emergency situations.

## II.    AUTHORITY

RCI Contract No. J1PCc-005
RCI Policy 21.001 Mail
BOP P.S. 5800.10 Mail Management Manual

## III.    APPLICABILITY

All Rivers Correctional Institution (RCI) employees, especially to the Chaplain(s), and Volunteers who are involved in the management, and/or operation and participation of religious programming and to all inmates.

## IV.    DEFINITIONS

Based on security, personnel and other concerns, the following definition shall govern the usage of resources at RCI.

### Chaplain
There is qualified Chaplain (or Chaplains) with minimum qualifications of (1) clinical pastoral education or equivalent specialized training and (2) endorsement by the appropriate religious certifying body. The Chaplain assures equal status and protection for all religions. (4-4512)

### Religious Activities
Any program or activity of a religious nature (i.e. worship, religious instruction, spiritual guidance, counseling, etc.) which operates entirely within the institution under the direction of the Chaplain.

### Religious Faith Group/Practice

A religious group, domination, or sect whose members regularly congregate for the purposes of conducting, practicing or exercising the sacraments, tenants and rites of a recognized structured religious belief system supported by documentation. Furthermore, a religious group must share common, ethical, moral or intellectual views which are not defamatory, racial, political or divisive in nature.

### Religious Volunteer or Spiritual Advisor

An individual or spiritual leader, preferably certified, who has met the necessary requirements by submitting the appropriate documentation, (Application for Volunteer, NCIC/NLETS Check, Volunteer Interview Summary, and Fingerprint Check) and has received the proper training with the intent of participating in a religious capacity.

## V.    POLICY

RCI will implement and execute a feasible religious service program including the management of religious activities and resources, accessible pastoral counseling, and spiritual leadership and community involvement. The religious services department will ensure equal status and protection for all religions. RCI will designate specific areas and provide the necessary equipment, within budgetary limitations, to conduct religious services and programs.

RCI 's has an average daily population of five hundred (500) or more inmates that requires a full-time Chaplain. [4-4513] RCI's Chaplain has been approved and designated to coordinate the religious service department, provide input, advice, guidance and to serve as a consultant regarding religious programming.

RCI provides that inmates have the opportunity to participate in practices of their religious faith that are deemed essential by the faith's judicatory, limited only by documentation showing threat to the safety of person involved in such activity or that the activity itself disrupts order in the institution. [4-4517]

All inmates will be afforded the opportunity to practice their religion and permitted to have access to the religious publications and approved religious items of their respective faith, as long as such does not pose a threat to the security of the institution, other inmates or staff members.

When deemed necessary for the security or orderly operations of RCI, the Chaplain, upon notification and approval from the Warden, may limit attendance at, participation in, or discontinue any religious activity or practice. The following activities are strictly prohibited:

- Animal Sacrifice
- Casting of Spells
- Curses or Incantations
- Nudity
- Self-Mutilation

- Encryptions
- Para-military Exercise
- Self-defense Training
- Sexual Acts
- Profanity

- Use of Weapons or Simulated Weapons
- Ingestion of Illegal Substance
- Alcohol Consumption
- Exclusion by Race
- Proselytizing

The above list is not exhaustive and can include any act which is determined to disrupt the security and orderly operation of RCI.

RCI requires that the institution provide space and equipment adequate for the conduct and administration of religious programs. The institution makes available non-inmate clerical staff for confident material.[4-4520] Unless otherwise notified, all religious activities will be held in RCI's Chapel. Only authorized inmate groups may participate in religious activities (i.e., group studies or prayer) outside the Chapel and/or individual cells. Authorization must be received through the Chaplain and Chief of Security.

All inmates must designate their religious preference at the initial teaming. Changes in an inmates religious preference will be permissible upon written request to the Chaplain. A schedule of religious services will be maintained and posted through out the institution on a monthly  basis. Revisions and updates will be made as necessary.

## VI.    PROCEDURE

The Chaplain has physical access to all areas of RCI to minister to inmates and staff. [4-4515] RCI provides that assigned Chaplain(s) whether they be classified employees, contract employees, or volunteers), in consultation with and with approval from facility administration, plans, directs and coordinates all aspects of the religious program, including approval and training of both lay and clergy volunteers from faiths represented by the inmate population. [4-4514]

### A.    Religious Publications and Religious Worship

1.    The Chaplain  screens and evaluates all proposals for special religious activities.

2.    Inmates will be afforded the opportunity to obtain religious publications.

3.    Religious publications can be made available during religious services and functions.

### B.    Procuring Religious Items

1.    The Chaplain shall approve religious items purchased by an inmate and approve all donations of religious materials and equipment.

2.    An inmate requiring an approved religious item deemed necessary by a bonafide religious faith, must first acquire a Special Purchase Order form and a Cash Withdrawal form from the Pod Officer or Unit Manager. Forms must be completed before submitting to the Chaplain

for approval. All religious vendors and items must be approved by the Chaplain before placing an order. Information concerning an approved vendor may be obtained from the Chaplain.

3.    All approved religious items must come directly from the vendor through the Chaplain's office as designated on the Special Purchase Order Request form.

C.    **Areas and Equipment for Religious Services**

1.    Religious services will be held in a designated area according to the capacity of the group. The designated area will be chosen by the availability of space within RCI.

2.    Equipment for religious services and functions will be made available as needed.

3.    The Chaplain, in cooperation with the Warden or designee, develops and maintains communications with faith communities and approves donations of equipment or materials for use in religious programs.(4-4521)

D.    **Relations within the Religious Community**

1.    The Chaplain or designated religious staff develops and maintains close relationships with community and religious resources. (4-4516)

2.    The Chaplain will approve and train both Lay and Clergy Volunteers from faiths represented by the inmate population when a religious leader of an inmate's faith is not represented through the Chaplaincy Staff or Volunteers

3.    Volunteers will be allowed to perform religious functions within the institution upon approval and training.

4.    All proposals for special religious activities must be submitted to the Chaplain for review and disposition at least six (6) weeks prior to the proposed event.

E.    **Religious Meals**
Religious meals shall include but not limited to vegetarian, kosher, or ceremonial meals. All religious meals must be approved by the Chaplain.

1.    Meals for inmates, whose religious beliefs require the adherence to religious dietary laws, will be approved by the Chaplain.

2.    Religious meal may be consumed on a regular basis and in accordance with established dietary restrictions required by specific

religious denominations.

3.      Religious meals will be composed of institutional foods unless specifically approved by the Warden and/or Chaplain.

4.      Special religious ceremonial meals may be approved but, not more than once per year.

## F.    Ceremonial Meals

1.      **Introduction**
RCI will permit and make provision for one (1) ceremonial meal for each approved religious faith group.

2.      **Formal Request**
All requests for ceremonial meals must be submitted to the Chaplain's office thirty (30) days prior to scheduled event for recommendation using the "Inmate Request to Staff". The recommendation will be forwarded to the Wardens.

3.      **Evaluation Process**
The Chaplain will meet with the approved religious faith group to determine needs and feasibility. Among to include the following:

- **Dates and Times**
To include all phases of the ceremonial meal.

- **Number of Participants**
To be subject to SENTRY roster limitations.

- **Required Menu Requirements**
Food specifications as required by each religious faith group. All requested religious requirements must by validated from the specific faith group published writings. All requests must have the final approval of the Warden.

4.      **Feasibility**
All applicable RCI departments will be notified of ceremonial meals to address concerns of each respective department. Included will be a SENTRY roster of the inmates who will be participating. Other issues will include, but not limited to, inmate movement and monitoring, menu requirement, meal serving times, location, etc..

## G.    Religious Publications

1.      **Introduction**
RCI will afford all inmates the opportunity to obtain religious publications.

2.    **Procurement**
All religious publications must be in compliance with admissibility requirements as outlined in RCI Policy 21.001Mail, and the Inmate Handbook, Mail and Correspondence.

Inmates may subscribe to and receive publications without prior approval, but are limited to five (5) newspapers and magazines. The term "publications" means a book, single issue of a magazine or newspaper, or materials addressed to a specific inmate, such as advertising brochures, flyers, and catalogs. Inmates may receive soft-cover publications (paperback books, etc.) from any source. Newspapers and hardcover publications may be received only from a publisher or a book club....Questions regarding proper procedures and regulations concerning incoming publications (brochures, flyers, catalogues, books, single issues of a magazine, newspapers) may be answered by your Unit Team and/or the Inmate Handbook.

3.    **Admissibility**
The Warden will reject a publication if it is determined to be detrimental to the security, good order or discipline of the institution, or if it might facilitate criminal activity. Publications which can be rejected by the Warden include, but are not limited to, publications which meet one (1) of the following criteria:

- It depicts or describes procedures for the construction or use of weapons, ammunition, bombs, or incendiary devices.

- It depicts, encourages, or describes methods of escape from correctional facilities, or contains blueprints, or drawings, or similar descriptions of Bureau of Prisons (BOP) institutions.

- It depicts or describes procedures for the brewing of alcoholic beverages or the manufacture of drugs.

- It is written in code.

- It depicts, describes, or encourages activities which may lead to the use of physical violence or group disruption.

- It encourages or instructs in the commission of criminal activity

- It is sexually explicit material that by its nature of content poses a threat to the security, good order, or discipline of the institution.

- Should any publication be rejected you will receive notification, then you will have five (5) days to file an Administrative

Remedy Form, RCI Step 1. The publication will he held at the facility for thirty (30) days pending the Step 1 process.

- Any publication which features nudity.

4. **Feasibility**

All incoming packages must be authorized in advance on a BP-331 Authorization to Receive Package or Property form unless otherwise approved under BOP P.S. 5800.10 Mail Management Manual. The forms may be obtained in your unit team. Packages containing magazines, books, and education material are authorized without an approved BP-331. Packages containing these items should by marked "Authorized by BOP" or "Contains Authorized Publication" or similar wording. Refer to the Inmate Handbook, Mail and Correspondence. The following constitutes a package that will require a BP-331:

- A box
- A Padded Envelope
- Any Object Wrapped in Paper

## H. **Procuring Religious Items**

1. **Introduction**

RCI will afford all inmates the opportunity to procure approved religious items.

2. **Procurement**

All religious vendors must be approved by the Chaplain's office. Each vendor submitted to the Chaplain in writing will be considered on an individual basis. An inmate must first complete a Special Purchase Order form and a Cash Withdrawal form obtained from the Pod Officer or Unit Team. The forms must be submitted to the Chaplain's office for approval. The approved items will come through the Chaplain's office directly from the vendor as earmarked on the Inmate Special Purchase Order Request form.

3. **Feasibility**

All religious items must be approved by the Chaplain prior to their purchase.

4. **Admissibility**

The following chart identifies the permissible religious items permitted to purchase from a designated outside vendor. The list is not exhaustive. Any additional purchases must be approved by the Chaplain. As religious groups are approved, their respective admissible religious property will be added.

I.  **Volunteers**

1.  **Introduction**
    The Chaplain will be directly responsible for operating and coordinating the citizen involvement and volunteer service program for inmates. When a religious leader of an inmates' faith is not represented through the Chaplaincy staff or Volunteers, the Chaplain assists the inmate in contacting a person who has the appropriate credentials from the faith judicatory. That person ministers to the inmate under the supervision of the Chaplain. [(4-4519)]

2.  **Application and Screening**
    The following steps will be completed for each Volunteer working in the facility:

    •    Application for Volunteer Service/Volunteer Application
    •    NCIC/NLETS Check
    •    FBI Fingerprint Check
    •    Volunteer Interview Summary

    Prospective volunteers will complete an Application for Volunteer Service/Volunteer Application and NCIC/NLETS. All Volunteers accepted for utilization will undergo an NCIC Criminal History Investigation and a Background Check. Upon fingerprinting, conducted by RCI, the Human Resources Manager will forward the Application for Volunteer Service/Volunteer Application, NCIC/NLETS Check, and Fingerprints to the BOP Contracting Officer (CO) in order to seek approval entrance for each Volunteer. Following the approval of entrance by the BOP, the Volunteer Coordinator (Chaplain) will interview the applicant, using the Volunteer Interview Summary Sheet, and make recommendations to the Warden in order to initiate training.

    The above required documentation submitted to the CO will include, but not limited to, data such as name, personal information, current address, date of birth, social security number, etc. The CO will initiate the National Agency Check which includes the FBI Name and Fingerprint Check. The CO will advise the Warden or designee of the results of the application. The CO will be the final approval authority for all Volunteers.

3.  **Training and Orientation for Citizen Involvement and Volunteer Services**

    a.    Approved Volunteers will be briefed of all rules and procedures important to their effective functioning. Actions shall be taken to ensure that volunteers understand their duties and

responsibilities. Volunteers shall abide by the employee standards of conduct both on and off duty. Inmates will be briefed during RCI's orientation about the role of citizen involvement and Volunteer services.

b.     Volunteers will be given a training/orientation seminar regarding RCI's rules, regulations, and operation pertaining to the volunteer service to be provided by the Chaplain or designee. Volunteers will complete an appropriate, documented orientation and/or training program prior to assignment.

## 4.     Confidentiality of Information

All Volunteers will be required to hold all information related to staff, inmates, or institution operations confidential. Any information, particularly those relating to the security and confidentiality of information, obtained by the Volunteer in the line of duty is only to be used in matters related to their work at RCI. Volunteers will sign a confidentiality statement during the orientation process.

## 5.     Volunteer Services Schedule

A schedule of volunteer service will be posted on bulletin boards of dormitories within the institution housing units.

## 6.     Registration and Identification of Volunteers

Each Volunteer will be required to sign the visitor's log upon entering and leaving RCI.

a.     The GEO Group, Inc., volunteer identification will be made for Volunteers upon successful completion of the volunteer application and background check.

b.     The GEO Group, Inc., volunteer identification card will have an identification picture of the Volunteer. The volunteer services ID card will be maintained and issued from the Public Entry desk. Individuals are not to take their volunteer services identification card out of RCI. When checking out volunteer services ID cards, individuals will be required to surrender some form of picture identification to the Receiving Officer. The Receiving Officer will issue the individual volunteer services ID card. Picture identification will be returned when the volunteer services ID is returned to the reception area. Individuals are required to wear their volunteer services ID at all times during their visits to the Institution. The ID should be worn over the shirt pocket or clipped on the collar.

7. **Participation of Volunteers in the Establishment of Policy and Procedure for the Volunteer Services Program**
The Chaplain will designate a member or members of each volunteer service to contribute suggestions in regards to the establishment of the policy and procedure as it pertains to volunteer services and citizen involvement.

8. **Professional Services**
It is the policy of RCI that Volunteers providing services requiring professional Licensor or certification provide proof of such license or certification before performing services. Volunteers will perform only the services for which they have been approved while functioning as a Volunteer.

I. **Introduction of a New Religion or Religious Components**
When necessary or requested by an inmate, the Chaplain will make provision for implementation of new religious faith groups or new religious components. An inmate interested in introducing a new religious faith group or new religious components is responsible for submitting a "Questionnaire Regarding New or Unfamiliar Religious Components" to the Chaplain.

Upon review of the submitted material, the Chaplain will forward the material with his recommendation to the Warden through the A/W of Programs for final approval. If a decision cannot reached locally, all information will be forwarded to the Regional and/or Corporate offices for further consideration. The Chaplain will provide in writing all decisions reached. All decisions are subject to security, personnel, and budgetary limitations and concerns.

J. **Telephone Calls**
The Chaplain may assist inmates with personal matters that may require a telephone call to a Pastor, family member, spiritual leader or the like. All calls of this nature will be monitored and at the discretion of the Chaplain. An inmate should inform the Chaplain in writing through the "Inmate Request Form" stating the nature of the call.

The Chaplain will document the call to include the following information:

- Inmate name
- Registration number
- Date
- Telephone number called
- Name of the person called
- Reason for calling

K. **Special Needs Inmates**
Inmates who are in the Special Housing Unit (SHU) or Medical will be provided the opportunity to participate in the practice of their faith under the

supervision of the Chaplain. The Chaplain will visit all special needs inmates weekly and will afford the opportunity of qualified/approved representatives of each recognized faith to have access to special needs inmates.

L.    **Work  Proscription**
Upon written request by the inmate to the Chaplain and in accordance with the religious belief of an inmate's faith, an inmate may be excused from work or given a different work assignment for an authorized religious holiday requiring work proscription. Consistent to the security, good order or discipline of the institution, the Warden or his designee will determine and/or approve all religious work proscriptions and observances.

M.    **Religious Diet**
The religious service department in conjunction with food services department will make available religious  diets to the inmate population as the individual religious groups require. In order to participate in the religious diet, an "Inmate Request Form" must be submitted to the Chaplain. The Chaplain, by way of the institutional call-out, will schedule an appointment for an interview with the requesting inmate. At this interview the inmate will fill out an "Authorization for Religious Participation" form and a final approval/disapproval will be rendered by the Chaplain. Upon final approval, the inmate's name will be entered into SENTRY. Food services will run a SENTRY roster as needed.


This policy shall be reviewed annually and updated as needed.


_____    _____
Warden                                Date

# Program Statement

**OPI:** CPD/RSB
**NUMBER:** P5360.09
**DATE:** 12/31/2004
**SUBJECT:** Religious Beliefs and Practices

1. [<u>PURPOSE AND SCOPE</u> §548.10.(a)  **The Bureau of Prisons provides inmates of all faith groups with reasonable and equitable opportunities to pursue religious beliefs and practices, within the constraints of budgetary limitations and consistent with the security and orderly running of the institution and the Bureau of Prisons.**]

2. **SUMMARY OF CHANGES**

- The use and type of religious headwear and religious garments are delineated;
- Due dates for the annual report have been changed;
- Some of the implementing text has been moved under appropriate rules language sections;
- The religious diet accommodation for the certified food component has been modified;
- The credentials required for religious contracts and volunteers have been clarified.  The required forms have been developed;
- Any religious group whose doctrine, rituals or practices espouse domestic and/or foreign terrorism, or advocates any type of violence will not be authorized to meet;
- Staff supervision requirements for inmate religious programs is delineated;
- Language requirements used in religious programming is defined;
- The unauthorized religious practices are expanded to include language or behaviors that could be reasonably construed as a threat to safety, security, or orderly running of the institution; and,
- The Ceremonial Meal Equity Formula Threshold is modified.

3. **PROGRAM OBJECTIVES.**  The expected results of this program are:

   a.  Religious accommodations will be made for all religions authorized to meet in Bureau of Prisons facilities.

b.  The religious rights of inmates of all faiths will be protected within the parameters of the security and orderly running of the institution.

c.  Religious resources will be equitably distributed for the benefit of all inmates.

d.  Pastoral care will be available to inmates and staff.

e.  Expertise on matters of religion in the correctional environment will be available for staff.

**[Rules - Bracketed Bold]**
Implementing Text - Regular Type

4.  **DIRECTIVES AFFECTED**

a.  **Directive Rescinded**

P5360.08  Religious Beliefs and Practices (5/25/01)

b.  **Directives Referenced**

P1350.02  Donations, Acceptance of (6/29/98)
P3420.09  Standards of Employee Conduct (2/5/99)
P3939.07  Chaplains, Employment, Responsibilities and Endorsements (10/26/01)
P4510.05  Inmate Contributions (1/26/99)
P4761.04  Special Foods or Meals From Outside Sources Introduced into Institutions (4/22/96)
P5264.07  Telephone Regulations for Inmates (1/31/02)
P5266.10  Incoming Publications (1/10/03)
P5267.07  Visiting Regulations (4/14/03)
P5280.08  Furloughs (2/4/98)
P5300.20  Volunteers and Citizens Participation Programs Manual (6/1/99)
P5326.04  Marriages of Inmates (12/17/98)
P5500.11  Correctional Services Manual (10/10/03)
P5500.12  Correctional Services Procedures Manual (10/10/03)
P5538.04  Escorted Trips (12/23/96)
P5553.06  Escapes/Death Notification (8/23/99)
P5580.06  Personal Property, Inmate (7/19/99)
P5800.12  Receiving and Discharge Manual (12/31/97)

T5303.01  Ministry of the Bureau Chaplains (6/1/95)
T5360.01  Practical Guidelines for Administration of Inmate Religious Beliefs and Practices  (3/27/02)

c.  Rules cited in this Program Statement are contained in
28 CFR §548.10-20 and 28 CFR §540.48.

5.  **STANDARDS REFERENCED**

a.  American Correctional Association Standards for Adult
Correctional Institutions 3rd Edition:  3-4261, 3-4265, 3-4274,
3-4300, 3-4301, 3-4374, 3-4375, 3-4387, 3-4454, 3-4455, 3-4456,
3-4457, 3-4458, 3-4459, 3-4460, 3-4461, 3-4462, and 3-4463

b.  American Correctional Association Standards for Adult Local
Detention Facilities 3rd Edition:  3-ALDF-3D-24, 3-ALDF-3E-04,
3-ALDF-4C-07, 3-ALDF-4C-08, 3-ALDF-4E-44, 3-ALDF-4E-45,
3-ALDF-4F-04, 3-ALDF-5F-01, 3-ALDF-5F-02, 3-ALDF-5F-03,
3-ALDF-5F-04, 3-ALDF-5F-05, 3-ALDF-5F-O6, 3-ALDF-5F-07,
3-ALDF-5F-09, and 3-ALDF-5F-10

c.  American Correctional Association 2nd Edition Standards for
the Administration of Correctional Agencies:  2-CO-5E-01

6.  **PRETRIAL, HOLDOVER, AND DETAINEE PROCEDURES.**  Procedures in
this Program Statement apply to Pretrial, Holdover, and Detainee
Centers.  The exception to these procedures exists where building
design prevents the maintenance of an outside worship area,
including the sweat lodge (see Section 12.c. of this Program
Statement).

7.  **RELIGIOUS OPPORTUNITIES AND LIMITATIONS §548.10 (b) [When
considered necessary for the security or good order of the
institution, the warden may limit attendance at or discontinue a
religious activity.  Opportunities for religious activities are
open to the entire inmate population, without regard to race,
color, nationality, or ordinarily, creed.  The warden, after
consulting with the institution chaplain, may limit participation
in a particular religious activity or practice to the members of
that religious group.  Ordinarily, when the nature of the
activity or practice (e.g., religious fasts, wearing of headwear,
work proscription, ceremonial meals) indicates a need for such a
limitation, only those inmates whose files reflect the pertinent
religious preference will be included.]**

a.  **Religious Accommodation.**  The level of scheduled activities
is expected to be commensurate with the institution's
mission/need.  Authorized congregate services will be made
available for all inmates weekly with the exception of those
detained in any Special Housing Units (SHUs).  If a state of
emergency exists (e.g. fog, institution lock down, food strike),
the warden or designee will determine the appropriate level of

P5360.09
12/31/2004
Page 4

chapel programming.  Inmates may recite formulaic prayers in the
language required by their religion.  Sermons, original oratory,
teachings and admonitions must be delivered in English.  The
warden may authorize the delivery of programs in other languages
only when it is appropriate to accommodate the overall needs of
the population.  Best correctional practices for each religion
are included in the Practical Guidelines for Administration of
Inmate Religious Beliefs and Practices Technical Reference
Manual.

The Warden may periodically review religious practices to
determine whether a religious practice remains within the scope
of best correctional practice and religious accommodation.  If
upon review, the Warden determines that a religious practice
jeopardizes institution safety, security and good order, the
practice may be temporarily restricted.  The religious practice
may resume only upon completion of a thorough evaluation of the
practice with respect to compelling government interests and
least restrictive alternatives.

To ensure the safety, security and good order of the institution,
any religious group that encourages domestic and/or foreign
terrorism, or advocates any type of violence will not be
authorized to meet.

   b.  **Religious Use of Wine**.  Inmates may be permitted to receive
small amounts of wine as part of a religious ritual only when
administered under the supervision of BOP chaplains, clergy
contractors, or clergy volunteers authorized by the Bureau to
perform the ritual.

   Because wine is otherwise a contraband substance, it can be
dispensed only under strict control and supervision.  Inmates
will not be allowed to give wine to other inmates.  For this PS'
purposes, the consumption of wine under these circumstances will
not be considered consumption of alcohol or ingestion of an
illegal substance.

   The institution will purchase the wine using normal procurement
procedures.  Wine will be secured in an appropriate area of the
chapel.  For scheduled services for which wine is authorized,
chaplaincy staff will provide the wine to the contract or
volunteer community minister in a disposable 2 ounce covered
container.  The container will be used to measure and transport
the wine.  The minister will dispose of the empty 2 ounce
container or any unused portion of the wine to protect against
contamination or abuse.  The chaplain will inform staff of

procedures for procuring, storing, and using wine.  This is
accomplished through ongoing training to avoid unnecessary and
potentially disruptive confiscation of essential sacred elements.

   c.  **Unauthorized Practices**.  The following religious practices
and activities are never authorized:

- animal sacrifice;
- language or behaviors that could reasonably be
  construed as a threat to safety, security, or the
  orderly running of the institution,(e.g., curses);
- nudity;
- self-mutilation;
- use, display, or possession of weapons or what appears
  to be a weapon (e.g., paper sword);
- paramilitary exercises;
- self-defense training;
- sexual acts;
- profanity;
- consumption of alcohol (except as noted in 7b,
  Religious Use of Wine);
- ingestion of illegal substances;
- proselytizing;
- encryption; and
- disparagement of other religions.

   d.  **Supervision of Inmates**.  Ordinarily the level of
supervision of inmate religious groups in secure facilities will
follow these guidelines for religious programs involving worship,
study or meetings.

- Inmate-led religious programs require constant staff
  supervision.
- Religious programs with Level I volunteers require
  constant staff supervision.
- Religious programs led by Level II volunteers and
  contractors require intermittent visual and audio
  supervision by staff.  This applies to both escorted
  and unescorted volunteers and contractors.
- Special Religious Programs (e.g. choirs, concerts,
  seminars) require constant staff supervision.

When necessary, Wardens may identify alternative practices and
implement the least restrictive alternative consistent with the
security and orderly running of Bureau institutions.

8.  __RELIGIOUS PREFERENCES__  **§548.10 (c) [The Bureau of Prisons
does not require an inmate to profess a religious belief.  An**

P5360.09
12/31/2004
Page 6

**inmate may designate any or no religious preference at his/her initial team screening. By notifying the chaplain in writing, an inmate may request to change this designation at any time, and the change will be effected in a timely fashion.]**

Unit staff will enter the initial religious preference (RLG) assignment into SENTRY at the inmate's initial classification. When the chaplain approves an inmate's request for changing a religious preference, the chaplain is responsible for making the necessary change in the SENTRY RLG assignment.

To maintain the security and orderly running of the institution, and to prevent abuse or disrespect by inmates, the chaplain will monitor patterns of changes in the inmate's declarations of religious preference.

In determining whether to allow an inmate to participate in a specific religious activity, as described in Section 7, [§548.10(b)] above, staff may wish to refer to the information reported on the intake screening form and the inmate's religious preference history. Inmates showing "No Preference" or indicating membership in a different faith group may be restricted from participating in activities deemed appropriate for members only.

9. **[DEFINITION §548.11. For purposes of this subpart, the term "religious activity" includes religious diets, services, ceremonies, and meetings.]**

10. **[CHAPLAINS §548.12. Institution chaplains are responsible for managing religious activities within the institution. Institution chaplains are available upon request to provide pastoral care and counseling to inmates through group programs and individual services. Pastoral care and counseling from representatives in the community are available in accordance with the provisions of §§ 548.14 and 548.19. The chaplain may ask the requesting inmate to provide information regarding specific requested religious activities for the purpose of making an informed decision regarding the request.]**

28 CFR §548.14 and §548.19 refer to Sections 12 and 17, respectively, of this PS.

a. **Chaplains as Pastoral Care Providers.** The chaplaincy department is directed by full-time Bureau chaplains. All chaplains are qualified pastoral care providers who have verifiable religious credentials and current religious endorsements.

P5360.09
12/31/2004
Page 7

Chaplains plan, direct, and supervise all aspects of the religious program and have physical access to all areas of the institution to minister to inmates and staff.  All institution chaplains are employed to:

- lead worship services in their own tradition (e.g., General Christian, Jewish, Buddhist, Catholic);
- provide professional spiritual leadership and pastoral care;
- accommodate the legitimate religious needs of inmates; and
- supervise institution religious activities.

Chaplaincy Services support staff may assist the chaplains in supervising the institution's religious activities and administrative duties, but may not perform duties reserved for professional chaplains.

(1)  **SHU Religious Access.**  Ordinarily, all inmates, except those in the SHU, have access to regularly scheduled congregate services.  Inmates of all faiths will have regular access to chaplains.  Upon written request, inmates may also have access to recognized representatives of their faith groups while in SHUs.  Each chaplain will provide pastoral care in SHUs and hospital units weekly.

Chaplains will provide opportunities for individuals to receive the sacraments and sacred rituals in SHUs.  This includes, but is not limited to, communion and Sabbath prayer items--matzo and grape juice.  Ordinarily, sacred pipe use will be accommodated in Administrative Detention.  The Warden may determine the circumstances under which the sacred pipe may be used in Disciplinary Segregation.

(2)  **Telephone Calls.**  Individual pastoral care includes counseling inmates and/or their families in personal crisis and family emergency situations.  When authorized by the warden, chaplains may facilitate inmate telephone calls in emergency situations.  No other chapel staff are authorized to facilitate these calls.

Each Chapel will be equipped with an additional telephone which is capable of recording inmate telephone conversations during the pastoral calls.  A notice in English and Spanish will be placed at the telephone location to advise the user that all conversations are subject to recording and that using the telephone constitutes consent.  This telephone will be separate from the telephones provided for staff use.

P5360.09
12/31/2004
Page 8

Chaplains will also maintain a telephone log which includes:

- the date, telephone number, and person called;
- name and register number of the inmate; and
- a brief reason for the call.

(3) **Women and Special Needs Inmates**

(a)  Pregnant inmates will be offered religious counseling to aid in making an informed decision whether to carry the pregnancy to full term.

(b)  The particular needs of women and special needs inmates may require the contracting of spiritual counselors or advisers for religious needs other than those of a specific faith tradition.

(4) **Deaths and Serious Illnesses.**  Each institution will establish clear procedures to involve a chaplain in notifying inmates and/or their families of serious illness or death of either inmates or their family members.  The chaplain will coordinate appropriate religious rituals at the time of an inmate's serious illness or death.

Also, the chaplain may advise the Warden regarding religious factors which may influence decisions concerning the performance of autopsies on deceased inmates and the proper disposition of the remains.

b.  **Introduction of New and Unfamiliar Religious Components.** Inmates may request the introduction of new or unfamiliar religious components into the Chaplaincy Services program.  When information is required regarding a specific new practice, the chaplain may ask the inmate to provide additional information which would be considered when deciding to include or exclude the practice from the Chaplaincy Services program.

(1) **Religious Issues Committee (RIC).**  When a decision cannot be reached locally, a RIC at the Central Office, appointed by the Assistant Director, Correctional Programs Division (CPD), will review inmate requests for introducing new religious components into the overall religious program.

The RIC is to meet as necessary and maintain records of its recommendations.  Periodically, the RIC will issue summary reports and recommendations to all Chief Executive Officers.

(2) **Requests.**  Inmate requests are made by completing the New or Unfamiliar Religious Components Questionnaire form (BP-S822).  This form, along with sufficient documentation on which to base an informed decision, will be submitted to the chaplain for routing to the Central Office RIC through the Warden and Regional Director.

Upon completing the review, the RIC will make recommendations to the Warden regarding the request's appropriateness.  The Warden will determine the local disposition of the request after the institution receives the RIC recommendations.

(3) **Implementation of the RIC Recommendation.**  Decisions regarding the Chaplaincy Services program's expansion rest with the Warden and are subject to the institution's parameters for maintaining a safe and secure institution and availability of staff for supervision.

11.  **[SCHEDULES AND FACILITIES §548.13**

  **a.  Under the general supervision of the warden, chaplains shall schedule and direct the institution's religious activities.]**

  Current program schedules will be posted in English and Spanish on bulletin boards clearly visible to the inmate population.

  **[b.  The warden may relieve an inmate from an institution program or assignment if a religious activity is also scheduled at that time.]**

  In scheduling authorized religious activities, chaplains will consider both the availability of staff supervision and the need to share the time and space available among the eligible groups.

  **[c.  Institutions shall have space designated for the conduct of religious activities.]**

  This designated space will be sufficient to accommodate the needs of all religious groups in the inmate population fairly and equitably.  Chaplaincy Services areas (inside and outside) will be neutral and suitable for use by various faith groups.  The general area will include:

- office space for each chaplain;
- storage space for the needs of the religious programs; and

■  proximity to lavatory facilities for staff and volunteers.

Management will make every possible effort to provide private office space for each chaplain.  One outside worship area will be maintained in a suitable, secure, and private location, except in institutions where building design or security considerations would prohibit its construction.  The single outside worship area should be large enough to accommodate all faith traditions requiring outside worship space.

12.  **[**<u>COMMUNITY INVOLVEMENT (VOLUNTEERS, CONTRACTORS)</u> §548.14

**a.  The institution's chaplain may contract with representatives of faith groups in the community to provide specific religious services which the chaplain cannot personally deliver due to, ordinarily, religious prescriptions or ecclesiastical constraints to which the chaplain adheres.]**

The term "representatives of faith groups" includes both clergy and spiritual advisors.  All contractual representatives of inmate faith groups will be afforded equal status and treatment to help inmates observe their religious beliefs, unless the security and orderly running of the institution warrants otherwise.  The volunteer must complete the Credentials of Religious Volunteer form (BP-S777) prior to his or her becoming a badged volunteer.  The form will be maintained in the Official Volunteer File.

**[b.  The institution chaplain may secure the services of volunteers to assist inmates in observing their religious beliefs.]**

Institutions unable to secure volunteers to meet religious needs may request a written waiver from the Regional Director.

Inmates may not place volunteers or contractors on their telephone lists or use the Inmate Telephone System to contact volunteers or contractors.  If a specific program need exists, the chaplain may facilitate and monitor a telephone call.  A Level I volunteer, a badged volunteer (Level II), or contractor will be neither a minister of record nor placed on an inmate's visiting list.

**[c.  The warden or the warden's designee (ordinarily the chaplain) may require a recognized representative of the faith group to verify a volunteer's or contractor's religious credentials prior to approving his or her entry into the institution.]**

Ordinarily, the credentials required for conducting worship services will be ordination.  In lieu of ordination credentials, adequate documentation of recognized religious and ministerial position in the faith community is required.

A qualified and credentialed non-citizen may be extended a religious services contract if permitted by the annual appropriations act and immigration law.

The prospective contractor must complete the Credentials of Religious Contractor form (BP-S778) prior to Bureau allocation of appropriated funds for a contract, whether for a one-time visit by Request for Purchase or multiple visits during the fiscal year, using the normal contracting procedures.  It will become part of the official Contractor Security File.

Ordinarily, inmates of any faith tradition will have access to their faith group's official representatives while in a SHU or hospital unit.  Usually this does not include hospitals that are outside the secure confines of the institution.  Inmates in SHU will make a written request to the chaplain for a visit with their faith representatives, and requests will be accommodated consistent with the terms of the representative's contract and the security and orderly running of the institution.

Faith group representatives will always be escorted in a SHU. As an alternative to facilitate supervision, the approved SHU visit may occur in the Visiting Room during regularly scheduled visiting hours.

13.  [__EQUITY__ §548.15.  **No one may disparage the religious beliefs of an inmate, nor coerce or harass an inmate to change religious affiliation.  Attendance at all religious activities is voluntary and, unless otherwise specifically determined by the warden, open to all.**]

14.  [__INMATE RELIGIOUS PROPERTY__ §548.16

**a.  Inmate religious property includes but is not limited to rosaries and prayer beads, oils, prayer rugs, phylacteries, medicine pouches, and religious medallions.  Such items, which become part of an inmate's personal property, are subject to normal considerations of safety and security.  If necessary, their religious significance shall be verified by the chaplain prior to the warden's approval.**]

Personal religious items may not be purchased with appropriated funds.  All personal religious property will be purchased either from commissary stock or through an approved catalogue source using the Special Purpose Order process.  No religious item may have a monetary value greater than $100.

**[b.  An inmate ordinarily shall be allowed to wear or use personal religious items during religious services, ceremonies, and meetings in the chapel, unless the warden determines that the wearing or use of such items would threaten institution security, safety, or good order.  Upon request of the inmate, the warden may allow the wearing or use of certain religious items throughout the institution, consistent with considerations of security, safety, or good order.**

**The warden may request the chaplain to obtain direction from representatives of the inmate's faith group or other appropriate sources concerning the religious significance of the items.]**

Two types of headwear are identified, religious and ceremonial. Religious headwear is worn throughout the institution and ceremonial headwear may be worn only in the Chapel.  If additional religious or ceremonial headwear not listed is requested, the procedures outlined in Section 10.b., Introduction of New and Unfamiliar Religious Components, are to be followed.

(1)  **Religious Headwear.**  A standard color and style generally eliminates the necessity for the religious headwear permit cards.  The cards are discouraged because of the perceived connotation of religious discrimination and/or violations of religious freedom and privacy.

In order to achieve uniformity, inmates who have a SENTRY religious preference listed below are authorized to wear the following religious headwear throughout the institution including the SHU consistent with **[14b]** above:

| | | |
|---|---|---|
| Jewish | yarmulke | black or white |
| MST of A | kufi | black or white crochet cap |
| Muslim | kufi | black or white crochet cap |
| Nation of Islam | kufi | black or white crochet cap |
| Native American | headband | multi-colored |

P5360.09
12/31/2004
Page 13

| | | |
|---|---|---|
| Rastafarian | crown | multi-colored (red, yellow, green threads running through a black cap) |
| Sikh | turban | white |

Headwear worn throughout the institution may not contain graphics or writing.  Crowns may not have a bill.  Headbands can be worn only in a circle, covering the forehead but not the crown of the head.  Inmates are authorized three items of religious headwear.

**Note:**     MST of A refers to the Moorish Science Temple of America.

(2) **Ceremonial Headwear.**  In addition, inmates who have a pertinent SENTRY religious preference may wear the following ceremonial headwear in the Chapel.  These are not worn to and from the Chapel or in any other area of the institution:

| | | |
|---|---|---|
| MST of A | fez | red |
| Odinist/Ásatrú | hlath (hlad) | brown with one or more embroidered runes |

The authorized hlath must contain embroidered runes.  Plain headbands without runes are not authorized.  Inmates are authorized one item of ceremonial headwear.

(3) **Religious Attire for Women.**  Scarves and headwraps (hijabs) are appropriate for female inmates who have identified a religious SENTRY preference of Muslim, Jewish, Native American, Rastafarian, and those of the orthodox Christian tradition:

| | | |
|---|---|---|
| Jewish | scarf | black or off-white |
| MST of A | scarf | black or off-white |
| Muslim | hijab | black or off-white |
| Nation of Islam | scarf | black or off-white |
| Rastafarian | scarf | black or off-white |
| Orthodox Christian | scarf | black or off-white |
| Native American | headband | multi-colored |

Inmates are authorized three scarves or headwraps.

Jumper dresses are always approved for women whose religion compels them to wear loose-fitting clothing for the sake of modesty.  Institutions housing females should have a supply of jumper dresses available in the laundry.

P5360.09
12/31/2004
Page 14

(4) **Ceremonial Clothing.** At the Warden's discretion, the following articles of personal religious clothing may be worn for services in the Chapel, but not on the compound, housing units or visiting room:

| | | |
|---|---|---|
| Jewish | kittel | a white prayer robe worn during some holiday services. |
| Muslim | kurta shirt | a knee-length shirt worn during the weekly Jumah service. |
| Native American | ribbon shirt | a multi-colored shirt worn during the Pow Wow. |
| Wicca | tabbared | a hoodless poncho or cape, earth brown color, worn during services. |

For Muslims, the shalwar (baggy pants) are not authorized. A jalabiyya (full-length robe) is not authorized. The kittel and kurta shirts are authorized for men only. The ribbon shirt and tabbared may be authorized for both men and women. Islamic inmates may not hem or wear their pants above the ankle.

(5) **Ritual Underclothing.** Temple garments and tzitzis are authorized for Mormon and Jewish inmates respectively. The Temple garments or ritual underclothing are authorized for Mormon (LDS) inmates. The tallis katan or tzitzis, a small four-cornered garment, is authorized for Jewish male inmates.

(6) **Transferable Religious Property.** A list of generally authorized and transferable inmate religious property is contained in the Practical Guidelines for Administration of Inmate Beliefs and Practices TRM. Additional personal religious property items may be approved locally by the Warden, but these must be sent home when transferring to another institution. Disposable headwear is made available in Receiving and Discharge for inmates requiring headwear while in transit.

**[c.  An inmate who wishes to have religious books, magazines or periodicals must comply with the general rules of the institution regarding ordering, purchasing, retaining, and accumulating personal property.  Religious literature is permitted in accordance with the procedures governing incoming publications. Distribution to inmates of religious literature purchased by or donated to the Bureau of Prisons is contingent upon the chaplain's granting his or her approval.]**

P5360.09
12/31/2004
Page 15

Inmates desiring to subscribe to religious periodicals or purchase religious books or literature may do so following procurement policy and procedures.  Retention of religious materials is governed by the provisions in the Program Statement on Inmate Personal Property.  Rejection of religious publications is governed by the procedures specified in the Program Statement on Incoming Publications.

Media resources purchased with appropriated funds will be provided equitably among the various religions.  All media materials must be religious in nature.  Material that is not considered religious in nature may not be procured through purchase or donation.  Media materials shall not denigrate or disparage any other religion or religious groups.  Donated religious media resources may be accepted in accordance with the Program Statement on Acceptance of Donations.

All media resources will be previewed by staff, or any other staff-designated volunteers, prior to distribution.

15.   **[WORK ASSIGNMENTS §548.17.  When the religious tenets of an inmate's faith are violated or jeopardized by a particular work assignment, a different work assignment ordinarily shall be made after it is requested in writing by the inmate, and the specific religious tenets have been verified by the chaplain.  Maintaining security, safety and good order in the institution are grounds for denial of such request for a different work assignment.]**

16.   **[OBSERVANCE OF RELIGIOUS HOLY DAYS §548.18.  Consistent with maintaining security, safety, and good order in the institution, the warden shall endeavor to facilitate the observance of important religious holy days which involve special fasts, dietary regulations, worship, or work proscription.  The inmate must submit a written request to the chaplain for time off from work to observe a religious holy day.  The warden may request the chaplain to consult with community representatives of the inmate's faith group and/or other appropriate sources to verify the religious significance of the requested observance.**

**The chaplain will work with requesting inmates to accommodate a proper observance of the holy day.  The warden will ordinarily allow an inmate to take earned vacation days, or to make up for missed work, or to change work assignments in order to facilitate the observance of the religious holy day.]**

The Central Office Chaplaincy Services Branch, CPD, maintains a
general list of recognized holy days to identify days on which
inmates of various faith groups may seek to be excused from work
and school attendance.  The list is published annually in an
Operations Memorandum (OM) but, because of the changing nature of
religious observances, it is not exhaustive.  Requests for days
off work and school attendance by members of religions not
included in the above-mentioned OM are to be given due
consideration and authorized by the Warden when appropriate.

Days free from work/school are determined by the religious
community standards and ordinances of faith groups.  As such, the
number of days off work for religious holy day observances is not
limited to one per year.  Absent religious community information,
the Bureau does not have the religious authority to determine
whether inmates should be free from work/school for religious
reasons on particular days.

17.  [<u>PASTORAL VISITS</u> §548.19.  **If requested by an inmate, the
chaplain shall facilitate arrangements for pastoral visits by a
clergy person or representative of the inmate's faith.**

   **a.  The chaplain may request an NCIC check and documentation of
such clergy person's or faith group representative's credentials.**

   **b.  Pastoral visits may not be counted as social visits.  They
will ordinarily take place in the visiting room during regular
visiting hours.]**

   (1)  **Minister of Record.**  For this section's purposes, the
minister of record is defined as that spiritual leader, clergy
person, or official representative, whom the inmate identifies
and the chaplain verifies, as a minister of the inmate's religion
of record.

   An inmate will identify a minister of record by submitting a
written request to the chaplain.  The clergy person the inmate
identifies will also submit a request for consideration as the
minister of record to the chaplain.  Following a review of the
minister's credentials and appropriate security checks, the
chaplain will request that unit staff place the identified clergy
person on the inmate's visitor list as the minister of record.
An inmate may only have one minister of record at a time.

   The minister of record will not count against the total
number of authorized social visitors an inmate is allowed to have
on his or her visiting list.  Additionally, if the institution

uses a point system to monitor social visits, visits from the minister of record will not be counted against the total number of visits allowed.

(2) **Official Visits from Faith Representatives (Other than Minister of Record).**  Visits from faith representatives other than the minister of record will be in accordance with the Program Statement on Visiting Regulations and may be counted against the total number of visits allowed.  The faith representative's credentials and appropriate security checks will be reviewed prior to scheduling the visit.  Refer to the Special Visits section of the Program Statement on Visiting Regulations.

(3) **Location.**  Visits with the minister of record or other official faith representatives will be accommodated in the visiting room during regularly scheduled visiting hours, and to the extent practicable, in an area of the visiting room which provides a degree of separation from other visitors.  Upon request, the visit may occur in a private visiting section contained in the visiting area if available.

- If space is not available, the visit may be rescheduled when private accommodations can be made in the visiting room during regularly scheduled visiting hours.

The Warden may limit the number of these official visits an inmate receives each month, based upon available resources.

18.  **[DIETARY PRACTICES §548.20**

**a.  The Bureau provides inmates requesting a religious diet reasonable and equitable opportunity to observe their religious dietary practice within the constraints of budget limitations and the security and orderly running of the institution and the Bureau through a religious diet menu.  The inmate will provide a written statement articulating the religious motivation for participation in the religious diet program.]**

(1) **Components.**  The religious diet program, called the Alternative Diet Program, will consist of two distinct components:

- One component provides for religious dietary needs through self-selection from the main line, which includes a no-flesh option and access to the salad/hot bar (where the salad/hot bar is part of the Food

Service Program).  In institutions where meals are served in prepared trays, local procedures will be established for providing the no-flesh component.

- The other component accommodates dietary needs through nationally recognized, religiously certified processed foods.

(2)  **Requests and Interviews.**  Inmates wishing to participate in the religious diet program will make the request in writing.  Chaplains will ordinarily conduct the oral interview and complete the interview form within two working days of the request.  When the interview is completed, the chaplaincy team will review the request to determine how to accommodate the inmate's stated religious dietary needs.

The inmate's interview responses will determine which component of the religious diet program best accommodates his or her religious dietary needs.

Inmates will review and sign a copy of the completed interview form.  Chaplains will document an inmate's refusal to sign the document.

(3)  **Notification**.  Inmates will be notified on the Notification of Religious Diet Accommodation (BP-S700), of the religious diet for which they are approved, based on their religious dietary needs (BP-S700).  Completed forms will be placed in section 6 of the Inmate Central File.

(4)  **SENTRY Record.**  The chaplain is responsible for entering pertinent information for each inmate approved to participate in the religious diet program into the SENTRY religious diet participant list within 24 hours of approval, under normal operations.  Food Service will begin serving those approved for the certified processed food line normally within two days of SENTRY notification, under normal operations.

(5)  **Monitoring.**  Both chaplains and food service staff will monitor the SENTRY religious diet participant list daily to ensure that all eligible inmates are served religious diet meals with minimal delay upon intake or redesignation.  Inmates who are not approved for the certified food line may request a re-interview at six-month intervals.

Chaplains will escort contract chaplains to the religious diet food preparation area randomly to monitor the preparation and serving of food items and compliance with religious dietary laws.

**[b.  An inmate who has been approved for a religious diet menu must notify the chaplain in writing if the inmate wishes to withdraw from the religious diet.  Approval for an inmate's religious diet may be withdrawn by the chaplain if the inmate is documented as being in violation of the terms of the religious diet program to which the inmate has agreed in writing.  In order to preserve the integrity and orderly operation of the religious diet program and to prevent fraud, inmates who withdraw (or are removed) may not be immediately reestablished back into the program.  The process of re-approving a religious diet for an inmate who voluntarily withdraws or who is removed ordinarily may extend up to thirty days.  Repeated withdrawals (voluntary or otherwise), however, may result in inmates being subjected to a waiting period of up to one year.]**

Prepared and wrapped trays will be provided for inmates approved for the certified food component.  Those who are observed eating from the main line may be removed temporarily from that component.  In addition, those who purchase and/or consume non-certified foods from the commissary may also be temporarily removed from that component.

The Warden has authority to remove inmates from and reinstate them to the program.  Ordinarily, this authority is delegated to the chaplains.  Inmates will be notified in writing (BP-S820) of a religious diet violation and potential removal from the religious diet program.  Removal is not punitive in nature but provides an opportunity for the inmate and staff to reevaluate this program's appropriateness to meet the inmate's demonstrated needs.  At the inmate's request for reinstatement, an oral interview will be conducted prior to reinstatement.

**[c.  The chaplain may arrange for inmate religious groups to have one appropriate ceremonial or commemorative meal each year for their members as identified by the religious preference reflected in the inmate's file.  An inmate may attend one religious ceremonial meal in a calendar year.]**

Ceremonial or commemorative meals will be served in the Food Service facilities, unless the Warden authorizes otherwise.  To maintain equity in menu design, all meals must be prepared from food items on the institution master menus.

Chaplains may use a small portion of the annual Chaplaincy Services budget to acquire traditional/ritual foods to supplement the mainline foods served for the ceremonial meal.  Ritual or traditional foods must be consistent with the faith group's religious dietary laws.

If purchasing ritual/traditional foods, a per capita equity formula is to be determined locally.  To determine the per capita cost, the total amount of appropriated funds designated for this purpose shall be divided by the total number of inmates participating in all ceremonial meals for the fiscal year.  To prevent waste or abuse, the total amount per faith group is to be no less than $10 nor greater than $200.

The Food Services Department is to be the only source of procurement for all meal items.  Foods for ceremonial meals may not be donated or catered.

An Inmate Request to Staff (BP-S148) must be submitted to the chaplain 60 days before the ceremonial meal requesting ritual/traditional foods.  The chaplain will consult with the Food Service Administrator to develop the menu for each ceremonial or commemorative meal at least 45 days before the scheduled date of the observance.  This facilitates timely food ordering and preparation.

d.  **Religious Fasts**.  There are generally two different types of fasts, a public and a private or personal fast.  When inmates observe a public fast, i.e. one which is regulated by law or custom for all the faith adherents, Food Service will provide a meal nutritionally equivalent to the meal(s) missed.

Public fasts usually begin and end at specific times.  Accommodations may also be made for bagged meals at times when Food Service is normally closed.  When an inmate fasts for personal, religious reasons, no special accommodations need to be made for the meal(s) missed.  Requests for meals after a personal fast should be determined on a case-by-case basis, applying sound correctional and pastoral judgment.

A list of public fast days is published annually in the OM on religious holy days, but, because of the changing nature of religious observances, it is not exhaustive.

19.  **ANNUAL REPORT**.  Each institution will submit an annual report to the Chaplaincy Services Branch, CPD.  The reporting year will be from October 1st through September 30th.  The institutions will receive the report forms each September from the Central Office Chaplaincy Branch.  The appropriate Associate Warden and Warden will sign the report prior to forwarding the report to the Regional Chaplaincy Administrator.

- A signed copy of the report will be retained in the chaplain's office.

The completed reports will be sent to the Regional Chaplaincy Administrators by the third Friday in November and the Regional Chaplaincy Administrators will forward the reports to the Central Office Chaplaincy Branch by the second Friday of December. The Chaplaincy Services Branch will compile the information and provide a summary report to the Regional Directors by the second Friday of May.

20. **INSTITUTION SUPPLEMENT.** Each institution will develop an Institution Supplement for operating religious programs and activities. The Institution Supplement requires the Regional Director's approval prior to issuance and must include the following:

a. Procedures for serious illness and/or death notifications;

b. Procedures for religious fasts, ceremonial meals and whether appropriated funds will be used to supplement the ceremonial meals with traditional/ritual foods;

c. Reasons for removal from the religious diet program and procedures for religious diet program reinstatement;

d. Procedures for acquiring authorized religious items when no catalog vendor is available (i.e. eagle feathers);

e. Authorized religious property;

f. Sweat Lodge procedures, including who may participate, modesty/security requirements, and medical clearance requirements if any;

g. Procedures and limitations for pastoral visits for inmates in general population and procedures for accommodating pastoral visits for inmates in special housing or hospital units;

h. Procedures and limitations for storage and provision of religious wine;

i. Indoor and outdoor areas authorized and designated for the ritual use of tobacco; and

j. Where applicable, procedures for procuring, storing, and using tobacco for rituals.

21. **BUREAU OF PRISONS FORMS.**  The following BP-Forms will be used in conjunction with this Program Statement:

- Questionnaire Regarding New or Unfamiliar Religious Components (BP-S822)

- Notification of Religious Diet Accommodation (BP-S700)

- Credentials Religious Volunteer (BP-S777)

- Credentials Religious Contractor (BP-S778)

- Notification of Religious Diet Violation (BP-S820)

22. **IMPLEMENTATION.**  Implementation of this Program Statement will occur within 90 days of the effective date of this policy.


                              /s/
                         Harley G. Lappin
                         Director

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **BOBBY CURRY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 07-0199 (JR)** |
| | ) | |
| **ALBERTO GONZALES, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

## ORDER

UPON CONSIDERATION of the Defendants' Motion to Dismiss or, in the Alternative, to Transfer Venue, support thereof, the grounds stated therefor and the entire record in this matter, it is by the Court this _____ day of _____, 2007, hereby

ORDERED that Defendants' Motion to Dismiss is GRANTED, and it is further

ORDERED that this case is DISMISSED WITH PREJUDICE.

This is a final appealable order.

SO ORDERED.

_____
UNITED STATES DISTRICT JUDGE